**In re GAYLORD CONTAINER COR-PORATION SHAREHOLDERS LITIGATION.**

**Civil Action No. 14616.**

Court of Chancery of Delaware, New Castle County.

Submitted: July 27, 1999.
Decided: Aug. 10, 1999.

Joseph A. Rosenthal, Carmella P. Keener, of Rosenthal, Monhait, Gross & Goddess, Wilmington, DE; Steven G. Schulman, Edith M. Kallas, Cary L. Talbot, of Milberg Weiss Bershad Hynes & Lerach, New York City, and Stephen Ramos, of Berger & Montague, Philadelphia, PA, of counsel, for Plaintiffs.

William O. LaMotte III, Karen Jacobs Louden, S. Mark Hurd, of Morris, Nichols, Arsht & Tunnell, Wilmington, DE; Thomas O. Kuhns, Timothy A. Duffy, of Kirkland & Ellis, Chicago, IL, of counsel, for Individual Defendants.

Lewis H. Lazarus, of Morris, James, Hitchens & Williams, for Nominal Defendant Gaylord Container Corporation.

OPINION

STRINE, Vice Chancellor.

Nearly four years into this purported class action, this court confronts the question of whether a class should be certified.[1] The answer to that question turns on whether the plaintiffs' *Unocal* claims allege special injury, justifying a characterization of them as stating individual, as well as derivative, claims. In this opinion, I conclude that the complaint does state individual claims and therefore that class certification is appropriate.

## I.

The facts necessary to resolve this motion are drawn from the complaint.

Defendant Gaylord Container Corporation ("Gaylord") manufactures and distributes prosaic items such as corrugated containers and grocery bags, without which America's consumerist economy would function quite cumbersomely. Before 1995, Gaylord's certificate of incorporation provided for two classes of common stock: Class A and Class B. When the two classes voted together, each Class A share was entitled to one vote and each Class B share was entitled to ten votes.

As of the beginning of 1995, Gaylord's founder, Chairman, and Chief Executive Officer, defendant Marvin A. Pomerantz, owned over 85% of the Class B stock, giving him 62% of the company's total voting power. Other Gaylord directors and officers held another 12% of the company's total voting power. As a result, Gaylord management wielded firm control over the company. Collectively, I will refer to Pomerantz and the other management holders as the "Management Hold-

---

1. Sadly, this motion has been litigated at a quite torpid pace. I note that Court of Chancery Rule 23(c) requires that the court shall determine whether an action shall be maintained as a class action "[a]s soon as practicable after the commencement of an action brought as a class action." In this case, the class certification motion was filed December 22, 1997 and lay dormant until I raised the issue at a scheduling conference. Needless to say, the resolution of this motion is later than practicable. Regrettably, this case is just one of many purported class actions in which the class certification issue has not been presented in compliance with Rule 23(c), a problem of which the members of this court are aware.

ers" and their combined stockholdings as the "Management Block."

In the late 1980's, Gaylord, like many businesses, began to suffer from the adverse effects of a recession. By 1991, Gaylord was unable to meet its debt obligations. As a result, it embarked on a pre-packaged financial restructuring pursuant to Chapter 11 of the federal Bankruptcy Code. The restructuring was consummated in September 1992.

As part of the restructuring, Gaylord was required to issue significant equity in the form of warrants and common stock to its creditors. Compl. ¶ 15. Most important, Gaylord was required to agree to a potential restructuring of its Class A and Class B common stock. The potential restructuring provided that if Gaylord's Class A stock did not reach and maintain a prescribed trading price then the outstanding Class B stock would automatically become Class A stock on July 31, 1995. The effect of such an occurrence would be to reduce the Management Holders' total voting strength from 74% to 20%.

As a result, Gaylord stockholder votes would no longer be controlled by the Management Holders.

By 1995, Gaylord's performance had improved substantially. Yet, its stock price had not reached the level sufficient to ensure that the Class B stock would not be eliminated. In late spring and early summer 1995, the Gaylord board of directors (the "Board") realized that the Management Holders would soon lose voting control of the company. According to the complaint, the Board therefore developed a strategy designed to maintain the Management Holders' continued control of the company.

The strategy began with the Board's adoption of a shareholder rights plan (the "Rights Plan," a.k.a., "poison pill") on June 15, 1995. Suffice it to say, the Rights Plan made it economically impractical for any possible acquiror to obtain control of Gaylord without the Board's approval.

The strategy was furthered by the Board's July 7, 1995 decision to call a stockholder meeting for July 21, 1995. The date of the meeting was significant, because it enabled the Management Holders—who were due to lose voting control on July 31, 1995—to control the outcome of the vote.

The meeting was called for the purpose of voting on proposed charter and bylaw amendments (the "Amendments") providing that:

> All stockholder action be taken at a meeting of the stockholders *and not by written consent;*
>
> Stockholder meetings be called only by the Chairman or the Board;
>
> A two-thirds vote is required to amend the bylaws and the provisions of the charter amended by the Amendments (the "Supermajority Amendment"); and
>
> Section 203 of the Delaware General Corporation Law, 8 *Del. C.* § 203, shall govern the company, thus preventing the merger of the company with a stockholder owning less than 85% of the company's stock absent Board approval.

Compl. ¶ 27.

The complaint alleges that the Rights Plan and the Amendments were adopted for the purpose of entrenching Pomerantz and his fellow Management Holders in their offices. Taken together, the Rights Plan and the Amendments constitute a formidable barrier to any potential acquiror not favored by the Management Holders. As a result of the Rights Plan and the Amendments, such an acquiror faces the following barriers:

> The Rights Plan, which is redeemable only by Board action;
>
> The need to acquire 85% of the company's stock not held by the Management Holders or to obtain Board approval for any merger as a result of the Amendment making 8 *Del. C.* § 203 applicable to the company;

An inability to utilize a consent solicitation to replace the Board and thereby reduce the problems created by the Rights Plan and § 203;

An inability to conduct a proxy fight except at the annual meeting or a time agreed to by the Board; and

An inability to repeal any of the Amendments except by obtaining an overwhelming majority of the shares not held by the Management Holders.

## II.

On December 19, 1996, this court, per Vice Chancellor Balick, denied the defendants' motion to dismiss the complaint for failure to state a claim and, as to the derivative claims, for failure to make a demand. *In re Gaylord Container Corp. Shareholders Litig.*, Del. Ch., Consol. C.A. No. 14616, mem. op., 1996 WL 752356, Balick, V.C. (Dec. 19, 1996).

As to the defendants' Rule 12(b)(6) motion, Vice Chancellor Balick held that the complaint stated a claim that the Rights Plan and the Amendments, taken in combination, constituted an unreasonable set of defensive measures adopted for an improper purpose. In this regard, he noted that:

While the rights plan is in effect, it seems economically unlikely that any party would acquire more than 15% of Gaylord['s] stock, let alone a majority. Considering normal voting behavior, it would be practically impossible for stockholders to reach the supermajority required to remove the charter and by-law amendments while the board continued to have at least the 20% voting power that it held when the dual-class structure expired. While the [A]mendments are in effect, stockholders who oppose the board's position on an offer could only wait until the next regular meeting to pursue a proxy contest or, if the chairman or board refuses to call a special meeting, file an action claiming breach of fiduciary duty. Of course,

timing is likely to be crucial to anyone interested in acquiring control of a company.

*In re Gaylord Container Corp.*, mem. op. at 7.

As such, Vice Chancellor Balick held that the defendants bear the burden under *Unocal Corp. v. Mesa Petroleum Co.*, Del. Supr., 493 A.2d 946 (1985), to demonstrate the reasonableness of these measures. In such circumstances, the "proper course" was "to deny the motion to dismiss, permit the plaintiffs to pursue discovery, and give the defendants an opportunity to satisfy the enhanced scrutiny standard. The court will then have a better basis to determine whether the board took proper precautions to protect stockholders from coercive takeover tactics or, as the plaintiffs claim, acted primarily to keep control." *In re Gaylord Container Corp.*, mem. op. at 8–9.

With regard to the defendants' Rule 23.1 motion, Vice Chancellor Balick held that demand was excused since "the board's adoption of the shareholder rights plan is subject to enhanced scrutiny and the circumstances alleged in the complaint create an inference of improper purpose." *Id.* at 9 (citing *Moran v. Household Int'l, Inc.*, Del. Ch., 490 A.2d 1059, 1071, *aff'd*, Del. Supr., 500 A.2d 1346 (1985); *Wells Fargo & Co. v. First Interstate Bancorp*, Del. Ch., C.A. No. 14696, mem. op. at 18, 1996 WL 32169, Allen, C. (Jan. 18, 1996)).

## III.

■ In the complaint, the plaintiffs seek certification on behalf of a class (the "Proposed Class") of all non-defendant Gaylord stockholders who "are being specially injured and deprived of the opportunity to maximize the value of their Gaylord shares by the wrongful acts of the [defendants] ... and whose franchise rights and voting control have been impaired by the [defendants'] unlawful actions."[2] Compl. ¶ 43.

**2.** I note, lest the reader think that I am un-      aware, that this case is rather unusual in that

The plaintiffs seek rescission of the Rights Plan and the Amendments, as well as monetary damages on behalf of the Proposed Class.

Although it is the plaintiffs' burden to demonstrate that the Proposed Class should be certified, the reality is that the defendants concede that most of the necessary prerequisites to class certification exist. Therefore, this opinion will only address the primary reason the defendants believe justifies denial of class certification. This reason is that the complaint allegedly states only derivative and not class claims, and therefore class certification would essentially be futile.[3]

### A.

The defendants' contention that the complaint fails to state a class claim was confusingly advanced as a "motion to strike." They now concede that this nomenclature was improper and that their argument must be treated as a motion for judgment on the pleadings.[4]

As a result, I will address the defendants' contention that the complaint does not state a class claim on that basis. If I agree with them, I will grant judgment on the pleadings dismissing Count One of the complaint and I will deny class certification. If I disagree with them, I will enter an order certifying the Proposed Class.

### B.

My decision to address the defendants' argument forces me to make one of the least precise decisions which regularly confronts members of this court— determining whether a complaint pleads derivative or individual claims, or both. To make this decision, I must determine whether the complaint pleads a "special injury" to the Proposed Class. *Lipton v. News Int'l, Plc,* Del.Supr., 514 A.2d 1075, 1078 (1986).

Special injury has been defined as an injury that is suffered by the plaintiff either "directly" or "independently" of the corporation. *Kramer v. Western Pac. Indus., Inc.,* Del.Supr., 546 A.2d 348, 351 (1988). Typically, a plaintiff has been found to have alleged a "special injury and may maintain an individual action" if he: i) "complains of an injury distinct from that suffered by other shareholders;" or ii) "a wrong involving one of his contractual rights as a shareholder." *Lipton,* 514 A.2d at 1078. However, according to the Supreme Court, these categories are not exclusive and the court "must look ultimately to whether the plaintiff has alleged 'special' injury, in whatever form." *Id.*

The application of this test—especially with respect to complaints challenging board actions taken for defensive reasons or in the context of change of control transactions—has yielded less than predictable results. Some of these results seem to flow from whether the plaintiff cited the correct magic words, rather than from any real distinction between the relief sought or the injury suffered. *Compare Kramer,* 546 A.2d 348 (attack on stock options and parachutes issued in con-

---

it involves a challenge to four year old defensive measures that, based on the record before me, appear to have had no influence upon any actual potential suitor.

3. After oral argument, I resolved two other issues raised by the defendants as barriers to class certification.

4. The plaintiffs initially would have had me reject this argument on procedural grounds. At oral argument, they retracted their objection. Even if they had not, I would have considered the argument. Although the plaintiffs had some legitimate cause for objec-

tion to the defendants' rather awkward approach to raising this argument, it makes little sense to duck the issue at this time. Unlike the plaintiffs, I do not read the scheduling order in this case as precluding the filing of a motion for judgment on the pleadings. Even if it did, I would be inclined to amend the order to enable consideration of this argument, which was raised by the defendants, *see* Defs.' Br. in Support of Mot. to Dismiss at 37–40; Defs.' Reply Br. in Support of Mot. to Dismiss at 10–12; but not addressed by my predecessor on the prior motion to dismiss.

nection with a merger was derivative because the plaintiff did not attack fairness of the merger price, even though the plaintiff alleged that the options and parachutes reduced the merger consideration received by the stockholder class) *with Parnes v. Bally Entertainment Corp.,* Del.Supr., 722 A.2d 1243 (1999) (attack on payments and asset transfers to CEO of corporation in connection with a stock-for-stock merger stated individual claim where the Supreme Court read the complaint as alleging that the merger price was unfair). As our Supreme Court has said, "the line between derivative and individual actions can become particularly vague in the area of suits challenging defensive takeover tactics." *Kramer,*[5] 546 A.2d at 352 n. 3.

At times, the answer to the question of whether a particular board action gives rise to a derivative claim, an individual claim, or both does not turn on the nature of the board action itself. Instead, the distinction turns on whether that action was taken in response to the immediately threatened or ongoing conduct of a third-party or whether the board's action was designed to thwart potential conduct by a third-party.

In *Moran v. Household Int'l, Inc.,* Del. Ch., 490 A.2d 1059, 1070, *aff'd,* Del.Supr., 500 A.2d 1346 (1985), this court held that the adoption of a shareholder rights plan was not subject to an individual challenge unless shareholders were actively engaged in a proxy fight which the rights plan would thwart. Its holding was based on the following reasoning:

> Plaintiffs' complaints, fairly read, reflect causes of action which are derivative in nature, not individual. Moran's first claim alleges that a majority of Household's directors manipulated the corpo-

rate machinery to entrench themselves in office by restricting the shareholders' right to make use of the proxy machinery to gain control of Household. Of course, a board of directors may not use the corporate machinery for the purpose of obstructing the legitimate efforts of dissident stockholders to undertake a proxy contest against management. *Schnell v. Chris–Craft Industries, Inc.,* Del.Supr., 285 A.2d 437 (1971). *However, where, as here, no shareholder is presently engaged in a proxy battle, and the alleged manipulation of corporate machinery does not directly prohibit proxy contests, such an action must be brought derivatively on behalf of the corporation.... Thus, although the Rights Plan's impact on proxy contests may ultimately alter the balance of power between shareholders and the board of directors, this allegation does not involve a contractual right of the shareholders.*

*Because the plaintiffs are not engaged in a proxy battle, they suffer no injury distinct from that suffered by other shareholders as a result of this alleged restraint on the ability to gain control of Household through a proxy contest. Furthermore, although D–K–M is Household's largest shareholder, holding approximately 5% of its stock, it does not suffer any unique injury merely by virtue of its holdings. There is no allegation that D–K–M desires to employ its block position as a means of gaining control of Household. I conclude, therefore, that this claim must be brought derivatively.*

The plaintiffs' second cause of action alleges a manipulation of corporate machinery which acts to deprive sharehold-

**5.** A non-exclusive list of other recent cases noting the uncertain nature of the derivative-individual distinction includes: *Parnes,* 722 A.2d at 1245; *Grimes v. Donald,* Del.Supr., 673 A.2d 1207, 1213 (1996); *Carmody v. Toll Bros., Inc.,* Del. Ch., 723 A.2d 1180, 1188–1189 (1998); *Wells Fargo & Co. v. First Interstate Bancorp,* Del. Ch., C.A. No. 14696, 1996 WL 32169, at *7, Allen, C. (Jan. 18, 1996); *see also* 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations* § 13.7 at 13–18 (1999) ("Balotti & Finkelstein") ("The line between derivative and individual actions has become particularly nebulous in the area of suits challenging defensive takeover tactics.").

ers of their right to receive and consider takeover proposals. *Although the Plan may indeed have the effect of limiting a shareholder's ability to consider takeover proposals, shareholders do not possess a contractual right to receive takeover bids. The shareholders' ability to gain premiums through takeover activity is subject to the good faith business judgment of the board of directors in structuring defensive tactics. Absent an allegation that the Rights Plan directly restricts transferability, there is no deprivation of a distinct contractual right of the shareholders.* Because plaintiffs do not allege any distinct injury from the alleged restriction on their ability to receive takeover bids, this claim may only be brought derivatively on behalf of Household.

The third cause of action alleges that the issuance of the rights is invalid under Delaware law. This claim clearly is derivative since it calls into question the authority of the Board to alter the capital structure of the corporation, not any contractual right of the shareholders or any distinct injury to the plaintiff.

490 A.2d at 1070–1071 (emphasis added).

In view of the doctrinal inconsistencies that exist in this area (as well as the benefit of insight gained by the substantial experience since *Moran* was decided)

there are several reasons why a reassessment of *Moran*[6] and its progeny in this particular respect, may be called for. Put another way, there might be some practical and doctrinal utility to reconsidering whether properly pled *Unocal* claims should continue to be regarded as presumptively derivative, rather than individual, in nature. By a *Unocal* claim, I mean a claim sufficiently alleging that a board of directors has taken actions designed to defend against an unwanted overture from a possible acquiror to the corporation's stockholders so as to invoke the heightened scrutiny required by the *Unocal* decision.

As an initial matter, the *Moran* test seems to turn on a distinction addressed more to the ripeness than to the nature of a *Unocal* claim—whether a rights plan has an imminent defensive effect or a prospective one. If a rights plan (or other defensive measure) has merely a prospective, even if real, deterrent effect, on the likelihood of an acquisition offer, its adoption by the board cannot be challenged in an individual action. If, however, a rights plan (or other defensive measure) is adopted in response to an actual acquisition proposal, the bidder[7] and shareholders aligned with the bidder may challenge the rights plan (or other defensive measure) as affecting their individual interests as stockholders.[8]

---

**6.** By questioning the continued utility of this aspect of *Moran*, I do not mean to question other aspects of that decision, which have well stood the test of time. Nor do I minimize the difficulty of the derivative-individual distinction the court was forced to make in that case, especially given the other substantial and novel questions the court was simultaneously required to address. The derivative-individual distinction made in *Moran* just seems to me to create the potential for the resolution of cases on rather enigmatic grounds, rather than on their real merits, an outcome inconsistent with the overall thrust of decisions like *Moran* and *Unocal*.

**7.** Under the case law, the bidder's standing in such circumstances has remained putatively tethered, if only by a bare thread, to its status as a stockholder.

**8.** *See, e.g., Tate & Lyle PLC v. Staley Continental, Inc.,* Del. Ch., C.A. No. 9813, 1988 WL 46064, at *8, Hartnett, V.C. (May 9, 1988) (where bidder-plaintiff attacked defensive measures, its claims were individual because it brought its claim as a potential acquiror in an effort to assist its tender offer); *GM Sub Corp. v. Liggett Group, Inc.,* Del. Ch., C.A. No. 6155, 1980 WL 6430, at *2, Brown, V.C. (Apr. 25, 1980) (bidder-plaintiff's claims that the target corporation's board sold an asset to impede plaintiff's tender offer was an individual claim because its suit was brought "in an effort to provide assurance that nothing will happen to cause it to deprive its fellow shareholders of an opportunity to sell their shares at a profit"); *Packer v. Yampol,* Del. Ch., C.A. No. 8432, 1986 WL 4748, at *13, Jacobs, V.C. (Apr. 18, 1986) (where defendants allegedly were obstructing an active proxy fight by plaintiffs, plaintiffs' action to remove the ob-

Note that in either case, the effects on the stockholders are similar and the nature of the board action is identical. The only difference is that in the latter case a live competition for control is influenced, and in the former case the potential for a competition for control has been reduced.

It is not apparent to me why any claim in the latter situation belongs to the stockholders individually as well as to the corporation, and why in the former case the corporation alone is injured. In both circumstances the board of directors has taken action to interpose itself between willing buyers and willing sellers of stock.[9] The mere fact that the one circumstance involves an actual buyer with an announced intention to purchase does not seem to me to change the basic nature of the stockholder interests at stake.

Nor is it clear to me why a board's action to interpose itself between stockholders who are ordinarily free to sell their shares, and purchasers who are ordinarily free to buy those shares—if improper—works an injury on the corporation as

an entity. In circumstances where directors act to protect against inadequate acquisition offers, they are acting to protect stockholders from selling at an inadequate price. If they act improperly and prevent stockholders from receiving a favorable offer, it is difficult to conceive how the corporation *qua* corporation is harmed. It is not at all difficult—in fact, it is quite obvious—how the stockholders *qua* stockholders are injured. *See* 1 Balotti & Finkelstein, § 13.7 at 13–17 (indicating that *Moran* reached the result it did "notwithstanding that it is arguable that the injury alleged [therein] fell exclusively on the stockholders and was not shared by the corporation.").

While I have no doubt that there is no *contractual* right on the part of stockholders to receive purchase offers, *Moran,* 490 A.2d at 1070, the only possible legal justification for the board to interfere is if the board is appropriately exercising its fiduciary duties.[10] In a capitalist nation like ours, I would think it inarguable that an owner of stock has the right to sell her

structions was individual); 1 Balotti & Finkelstein, § 13.7 at 13–18 ("Action taken to prevent a specific stockholder from conducting a proxy contest or a tender offer may constitute 'particular injury' to that stockholder, and thus the claim may be asserted individually."); 3 Ernest L. Folk, III et al., *Folk on the Delaware General Corporation Law* § 327.2.1.4 at GCL–XIII–46 (1999) ("Folk, Ward & Welch") ("Claims challenging corporate efforts to thwart a change of control may be brought individually if the plaintiff has indicated a desire to use its holdings to gain control of the corporation."); *see also City Capital Assocs. v. Interco, Inc.,* Del. Ch., 551 A.2d 787, 800 (1988) (where plaintiff was asserting its "interests as a buyer, not a seller of stock" the court granted the injunction because it would "make little sense for the court, having determined that the board now has a duty to shareholders to redeem the [poison pill], to fail to protect shareholders by not enforcing that duty specifically"); *cf. Revlon, Inc. v. MacAndrews & Forbes Holdings,* Del.Supr., 506 A.2d 173, 184–185 (1986) (emphasis added) (affirming ruling that plaintiff would suffer irreparable injury without injunction against defensive measure since the plaintiff's "opportunity to bid for *Revlon* [would be] lost").

9. I note in this regard that the proxy contests at issue in corporate control cases are usually linked to acquisition offers.

10. It is also worth remembering that the power of even a well-intentioned board to take corporate action solely to prevent otherwise willing stockholders from receiving sales offers is quite different from the power to decide whether the corporation should manufacture buggies or electric cars. The former power arguably stretches the theoretical limits of fiduciary power by having the (at least quasi-) agents (i.e., the directors) influence or, in some instances, dictate whether the principals (i.e., the stockholders) can sell the enterprise. *Cf. Interco,* 551 A.2d at 799–800 ("To acknowledge that directors may employ the recent innovation of 'poison pills' to deprive shareholders of the ability ˙ effectively to choose to accept a noncoercive offer, after the board has had a reasonable opportunity to explore or create alternatives, or attempt to negotiate on the shareholders' behalf, would, it seems to me, be so inconsistent with widely shared notions of appropriate corporate governance as to threaten to diminish the legitimacy and authority of our corporation law.").

property, free and clear of unreasonable restrictions imposed by the directors of the corporation she partly owns. Why should our law not recognize such an unquestionable right as individual?

Although defensive measures may well be proper and beneficial to stockholders, that does not change the reality that they often involve a shift of power to insiders at the expense of the public stockholders. Such a shift in corporate power dynamics, if it works an injury, would seem (but for *Moran's* statement to the contrary) to injure those who lose power in the shift, not the corporate entity or the management-affiliated stockholders. In such circumstances, logic would seem to dictate characterization of a plaintiff's *Unocal* claim as individual.

Moreover, cases after *Moran* recognize that breaches of fiduciary duties by boards may cause "special injury" to stockholders, without violating any specific contractual right to, e.g., a certain degree of voting power. Rather, if it is alleged that the directors reduced the voting power of stockholders through inequitable action, that suffices to state a direct claim, *see In re Tri–Star Pictures, Inc. Litig.*, Del. Supr., 634 A.2d 319, 330–331 (1993), *even if such a reduction could have been effected by a properly motivated and behaved board. See also Lipton*, 514 A.2d at 1084–1085 (where sale of 19% of the corporation's stock to a friendly party gave the friendly party and the corporation's management veto power over a change in corporate management and other important corporate transactions, the corresponding reduction in other stockholders' voting power was sufficient to constitute special injury); *Avacus Partners, L.P. v. Brian*, Del. Ch., C.A. No. 11001, mem. op. at 14, 1990 WL 161909, Allen, C. (Oct. 24, 1990) (where board issues stock so as to dilute the voting power of stockholders and amends bylaws to require an 80% vote to remove directors, stockholders suffer special injury); *cf. Carmody v. Toll Bros., Inc.*, Del. Ch., 723 A.2d 1180, 1189 (1998)

(where shareholder rights plan prohibited the stockholders from electing a new board in the future with the authority to redeem the rights under the plan, the stockholders pled special injury).

Thus, the *contractual* nature of the voting right—which itself is usually limited to the simple right to cast a vote on certain corporate matters—has had little to do with the actual cases finding an individual injury because the voting power of stockholders was diminished, coerced, or rendered misinformed by fiduciary breaches. Instead, a recognition that a wrongful impairment by fiduciaries of the stockholders' voting power or freedom works a personal injury to the stockholders, not to the corporate entity, seems to better explain the results reached. Recognizing a stockholder's individual right to receive sales offers without improper interference from a corporate board is logically consistent with cases like *Lipton, Tri–Star, Avacus,* and *Toll Brothers.*

If the derivative-individual distinction in *Moran* rests on the fact that defensive measures such as rights plans affect all stockholders equally, that distinction must deal with the reality that in most situations the directors and managers of the corporation hold shares. The inside holders' interests *qua* shareholders might not be affected all that differently by defensive measures, but their total economic interest in the corporation is often affected quite differently by defensive measures than are the interests of public stockholders having only an ownership stake. Hence, the justification for the *Unocal* standard of review. In addition, the inside holders have deprived only the non-inside stockholders of the right to freely receive purchase offers, since the insiders—in their capacity as directors—can decide to tear down the defenses when they themselves wish to accept such an offer.

A consideration of which stockholders should recover damages in a case where the directors, as well as public stockholders, hold stock and the plaintiffs demon-

strate that defenses caused monetary harm to the stockholders also suggests an individual characterization of a *Unocal* claim. *Grimes v. Donald,* Del.Supr., 673 A.2d 1207, 1213 (1996) (indicating that the relief which would flow to plaintiff is relevant to the derivative-individual claim distinction). In a case where wrongfully erected defenses are proved to have damaged the stockholders by causing the stockholders to lose a sales opportunity or to sell at too low a price, should the directors be entitled to recover damages for the economic injury they inflicted on themselves as stockholders? If the answer is no because of the fact that they created the harm, this factor would support awarding relief to the class of innocent stockholders, not to the corporation.[11]

An individual characterization is also plausible even in a scenario where there are no management holders and all stockholders equally suffer an injury because of the wrongful use of a defensive barrier. For example, where a Rights Plan or other defensive measure causes quantifiable economic injury equally to *all* stockholders of a corporation owned wholly by public stockholders because *all* the stockholders lost a valuable opportunity to sell, a derivative characterization is quite strained. After all, the injury suffered results from the directors' action impeding the stockholders from divesting themselves of their personal property, not from actions of the directors directly impairing the value of the enterprise itself to the indirect detriment of all stockholders. "A wrong is derivative in nature when it injures the shareholders indirectly and dependently through direct injury to the corporation." *Avacus,* mem. op. at 12 (*citing Kramer,* 546 A.2d at 353). The economic harm caused to the stockholders by a board's improper use of a rights plan to prevent stockholders from receiving a valuable sales offer will not be reflected on the corporation's balance sheet or, I would venture, in a going concern valuation of the corporation.

Therefore, why should damages be awarded to the enterprise to remedy the economic harm caused because its owners were not permitted to sell their personal property? *Cf. Parnes,* 722 A.2d at 1246 (where plaintiff alleged that other bidders who might have paid a higher price than the eventual acquiror were unwilling to make improper payments to an insider and that the price of the merger that was ultimately consummated was unfair as a result of such payments, the plaintiffs stated an individual claim). The mere fact that such an injury is to the economic property rights of all the stockholders rather than to their voting rights does not make the injury suffered any less "special" and non-corporate.[12] *See Avacus,* mem. op. at 13 ("The fact that all shareholders have been affected equally does not make this claim of improper interference with the right to vote a corporate claim."). As learned commentators have noted:

11. If the relief sought by the plaintiffs is solely or primarily injunctive in nature, this factor (the nature of the relief sought) would seem to be neutral, if not supportive of individual, rather than exclusively derivative, classification so long as the individual claim is asserted on a class basis. *See Grimes,* 673 A.2d at 1213; *but see Wells Fargo,* 1996 WL 32169, at *7 (suggesting the opposite inference).

12. I acknowledge that defensive measures may cause corporate injury as well. For example, an excessive termination fee in a merger agreement could, if it actually has to be paid by the corporation, cause corporate injury. If, however, the excessive fee works as a defensive measure and wrongfully prevents stockholders from receiving a more valuable offer, the resulting injury would seem to be personal to the stockholders and not involve harm to the corporate entity itself. Even in the former case, if the fee is paid and the plaintiff alleges that the fee contributed to making the consideration received in an alternative transaction unfair, the plaintiff may, per *Parnes,* challenge it in an individual action. Moreover, where a termination fee is preclusive of a stockholder-bidder or coercive of stockholder-purchasers as voters, our case law would already dictate an individual, as well as derivative, characterization of an attack on the fee.

[*Moran's* ] holding that a direct action was not available because all existing shareholders were treated the same appears limited to those instances in which no existing shareholder has undertaken a control or proxy contest. Even as so limited, however, [*Moran's* ] focus on the similarity of treatment misses the central point that fundamental shareholder rights (e.g., voting and alienability) can be infringed by a variety of board actions that treat existing shareholders alike.

2 *Principles of Corporate Governance: Analysis & Recommendations*, § 7.01 n. 3 at 30 (1994).

Nor would an individual characterization of *Unocal* claims give rise to a flood of new claims or a usurpation of the right of corporate boards to consider whether to bring claims properly belonging to their corporations. This is so for a few reasons.

The derivative-individual claim distinction is already of no practical importance at the pre-transaction stage of corporate litigation—the stage at which *Unocal* claims are often most hotly contested. So long as the plaintiff states a claim implicating the heightened scrutiny required by *Unocal,* demand has been excused under the *Aronson v. Lewis,* Del.Supr., 473 A.2d 805 (1984), demand excusal test. *Moran,* 490 A.2d at 1071; *Toll Bros.,* 723 A.2d at 1189; *Wells Fargo & Co. v. First Interstate Bancorp,* Del. Ch., C.A. No. 14696, 1996 WL 32169, at *8, Allen, C. (Jan. 18, 1996); *In re Chrysler Corp. Shareholders Litig .,* Del. Ch., C.A. No. 11873, mem. op.

at 10, 1992 WL 181024, Jacobs, V.C. (July 27, 1992).

Similarly, where plaintiffs challenge the substantive unfairness of a merger protected by defensive measures, their claims are said to be direct. *See, e.g., Parnes,* 722 A.2d at 1245. Therefore, characterizing a well-pleaded *Unocal* claim as individual rather than derivative does little, if anything, to encourage additional end-runs around board control of corporate claims.

Moreover, settled case law indicates that a potential acquiror may bring an individual action to challenge defensive actions impeding its bid, and plaintiffs sympathetic to such acquirors seem to have been swept along in the acquirors' wake. *See, e.g., Tate & Lyle PLC v. Staley Continental, Inc.,* Del. Ch., C.A. No. 9813, 1988 WL 46064, at *8, Hartnett, V.C. (May 9, 1988); *GM Sub Corp. v. Liggett Group, Inc.,* Del. Ch., C.A. No. 6155, 1980 WL 6430, at *2, Brown, V.C. (Apr. 25, 1980); *see also* 1 Balotti & Finkelstein, § 13.7 at 13–18; 3 Folk, Ward & Welch, § 327.2.1.3 at GCL–XIII–46. In this regard, it is worth noting that *Moran's* statement that *stockholders* have no distinct right (i.e., separate from the board's control) to *sell* their shares has led to the anomalous [13] recognition of an individual right to challenge board actions restricting a *stockholder-bidder* from *acquiring* a company. That is, Delaware law now seems to recognize a stockholder's individual right to make, but not to receive, a takeover offer without improper interference from the target corporation's board.[14]

13. I say anomalous because directors arguably owe no fiduciary duties to stockholders as bidders. While I believe there is a strong policy rationale for according bidders standing to challenge as lacking legal justification board actions that impede a bidder's free market rights unless the board is acting in accord with its duties to the stockholders, *see* n. 14 *infra,* the directors' obligations as fiduciaries would seem to flow primarily, if not exclusively, to the stockholders in their capacities as holders or prospective sellers.

14. There are very sound practical, value-enhancing reasons for the case law according

bidders standing, even though the practice of according *bidders standing as stockholders* leads to a certain amount of undeniable doctrinal incoherence. *See generally* J. Travis Laster, *The Line Item Veto and* Unocal: *Can a Bidder* Qua *Bidder Pursue* Unocal *Claims Against a Target Corporation's Board of Directors?,* 53 Business Lawyer 767 (1998). There are also very sound doctrinal reasons for recognizing that defensive measures primarily affect stockholders as prospective sellers and bidders (regardless of stockholder status) as prospective buyers, and enabling each to bring individual actions to protect their

At the post-transaction stage where plaintiffs challenge pre-transaction defensive actions, the derivative-individual claim divide regains significance because of the continuous ownership requirement of 8 *Del. C.* § 327 and Court of Chancery Rule 23.1. In a merger extinguishing plaintiffs' status as stockholders, the question of whether the plaintiffs' claims are individual or derivative becomes outcome determinative. If the claims are individual, the plaintiffs' claims survive the merger. If not, the plaintiffs' claims are extinguished. Thus cases like *Kramer* and *Parnes. See also In re First Interstate Bancorp Consol. Shareholder Litig.,* Del. Ch., 729 A.2d 851, 861–862 (1998) (where plaintiffs alleged that certain pre-merger acts by the defendant directors reduced the merger consideration but did not render the merger price unfair, the claims were derivative and were extinguished by the merger). Even so, the need to apply the derivative-individual claim distinction in such cases is not obvious.

Undoubtedly, there is a need to prevent windfalls to plaintiffs who have accepted the benefits of a corporate transaction extinguishing their ownership of stock and who continue thereafter to challenge the transaction. The question is whether the test for distinguishing between individual and derivative claims really is the best way to do that. Other possibilities would seem more direct.

For example, those stockholders who freely vote to accept the benefits of a transaction should be barred from recovery on that basis alone.[15] Such a result is consistent with the teaching of prior cases. *See, e.g., Bershad v. Curtiss–Wright Corp.,* Del Supr., 535 A.2d 840, 848 (1987) ("when an informed minority shareholder either votes in favor of the merger or . . . accepts the benefits of the transaction, he or she cannot thereafter attack its fairness").

Where the plaintiffs lose stockholder status against their will, they could still be required to prove that the transaction eventually consummated, taken in its entirety and not as to component parts or as to the steps (including defensive measures) leading to it, was unfair.[16] This might be a more direct, and less erratic, method to achieve the desirable and necessary end of denying unfair windfalls. The confluence of *Parnes* and *Kramer* will in reality indirectly create such a "bitter with the sweet" method, but in the non-merits context of an evaluation of whether the plaintiff's complaint challenges the overall fairness of the deal and therefore states an individual claim. An appropriate application of ordinary business judgment rule and entire fairness principles should be adequate to eliminate such windfalls, which in the post-squeeze out transaction context do not involve stockholders who purchased their shares to buy into litigable claims.

And in a circumstance such as exists in this case, the practical importance of the distinction between the direct and derivative nature of the plaintiffs' *Unocal* claims seems trivial, if not non-existent. Because Vice Chancellor Balick ruled that the complaint stated a claim triggering heightened scrutiny under *Unocal,* he also held, per *Moran,* that demand was excused under *Aronson.* Therefore, this case will proceed to a summary judgment motion or trial regardless of my ruling on this motion. That is, my ruling on this motion will not influence whether or how I address the merits of the plaintiffs' claims. It will

---

legitimate interests in being able to deal with each other without improper (i.e., not fiduciarily compliant) interference by corporate boards. Such a reality-based approach seems to have little downside and is a more straightforward manner in which to address cases implicating *Unocal.*

**15.** Or who buy stock and challenge the earlier adoption of properly disclosed defensive measures.

**16.** If the business judgment rule presumption is rebutted then the defendants would simply have to show that their actions, taken as a totality, were fair.

essentially only determine whether I certify a class.[17]

I highlight all these issues simply because I believe that there may be value to rethinking the derivative-individual claim distinction in the area of defensive measures. One of the great virtues of *Unocal* is that it strips away doctrinal barriers to a substantive examination of whether directors, in circumstances fraught with the potential for conflicts of interest between themselves and the stockholders, have fulfilled their fiduciary duties. The hair-splitting and illusive analysis required to determine whether a *Unocal* claim is individual or derivative seems somewhat at odds with *Unocal's* merits-based approach to the resolution of corporate control cases. Given the limited consequences that flow from such analyses because of the automatic demand excusal and the multiple exceptions to derivative characterization that accompany claims invoking *Unocal*, it is unsurprising that courts have at times simply decided it was not worthwhile to classify such claims before trial. *See, e.g., Wells Fargo*, 1996 WL 32169, at *8. The effort required seems out of proportion to any substantive benefit thereby achieved.[18] For today's purposes, however, I must apply the law as it stands.

### C.

In view of *Moran*, if the plaintiffs only challenged the Board's adoption of the Rights Plan, then the complaint would not have stated an individual claim. But the complaint, as interpreted by Vice Chancellor Balick, challenges the Rights Plan and the Amendments as an interrelated set of defensive measures motivated solely by the desire of the defendant directors to entrench themselves in their corporate offices. In a case where the plaintiffs attack a combination of board actions as operating in tandem to injure the stockholders, "the focus properly rests on the cumulative impact of [the actions] on the minority" in determining if the claims are individual or derivative. *Tri-Star*, 634 A.2d at 331 (emphasis omitted).

"Although entrenchment claims may be either individual or derivative, '[a]n entrenchment claim ... [is] ... individual ... when the shareholder alleges that the entrenching activity directly impairs some right she possesses as a shareholder.'" *Toll Bros.*, 723 A.2d at 1188–1189 (quoting *Avacus*, mem. op. at 13). Where the entrenching actions of a corporate board have the purpose and effect of reducing the voting power of stockholders, the affected stockholders may bring an individual action. *See, e.g., Tri-Star*, 634 A.2d at 330; *Lipton*, 514 A.2d at 1084–1085; *Toll Bros.*, 723 A.2d at 1189; *Avacus*, mem. op. at 14.

In this case, the Amendments markedly diminish the voting power of the Gaylord stockholders. Absent the Amendments, Gaylord stockholders could remove the Gaylord Board by written consent at any time. After the Amendments, Gaylord stockholders may only elect directors at the annual meeting or at a special meeting called by the Board or its Chairman, Pomerantz. *See Avacus*, mem. op. at 14 ("The changed by-laws can harm only the shareholders directly because this change in the governance structure of the corporation is a matter that directly involves the shareholders' right to elect and remove di-

---

17. It may also influence the possible remedy, but not in any manner that cuts against an individual characterization of the claims. There are other equitable methods (other than a derivative characterization) to tailor relief that does not provide anyone with a windfall. The issue of who, if anyone, is responsible for attorneys' fees to successful class counsel also seems manageable.

18. At oral argument, for example, the parties could provide me with little, if any reason, why the characterization to be made is at all substantively consequential in this case. The defendants cited to the fact that if the Proposed Class is certified, that Gaylord stockholders will be notified that they have a class claim, giving rise to some bad publicity for the company.

rectors."). Absent the Supermajority Amendment, Gaylord stockholders would have had the authority to amend the corporate bylaws and undo the Amendments by majority vote. After the Supermajority Amendment, the Gaylord stockholders have to muster a huge majority to secure the two-thirds vote now necessary to accomplish these acts over the objections of the Management Holders. *Cf. Lipton,* 514 A.2d at 1084–1085 (issuance of stock that gave friendly party and management the voting power to block corporate transactions gave rise to an individual claim).

Moreover, in no non-formalistic sense can the Rights Plan and the Amendments, taken together, be said to affect all stockholders equally. Although a Gaylord share is a Gaylord share, the reality is that the Rights Plan and the Amendments affect the non-Management Holders and the Management Holders differently. The Rights Plan and Amendments operate in tandem to increase the power the Management Holders wield over the corporation, both as stockholders and directors, to the detriment of the non-Management Holders.

In the wake of the Rights Plan and the Amendments, the Management Holders as Board members have the authority to block a hostile acquiror by refusing to redeem the Rights Plan, waive § 203's application, or call a special meeting for the purpose of holding a special election. Because the Amendments reduce the likelihood that the Management Holders will be removed as Board members, the Amendments also make it more probable that the Management Holders will continue to sit on the Board and wield this authority.

Purely as stockholders, the Management Holders have also increased their blocking power, because of the Supermajority Amendment. Furthermore, because this Amendment increases the blocking power of the Management Block, the Amendments therefore also arguably increase the economic value of the Management Block, an increase not shared with the non-Management Holders.[19] *Cf. Tri–Star,* 634 A.2d at 330 (where transaction increased value of controlling stockholder's interest at expense of minority, this factor supported a finding of special injury).

█ Although the increased power of the Management Holders under the Rights Plan and the Amendments is not insurmountable, that those acts increased the power of the Management Holders at the expense of the non-Management Holders cannot be reasonably questioned. When a corporate board undertakes related actions that diminish the ability of non-management stockholders to elect a new slate of directors, entertain sales proposals, and to amend the corporation's charter and bylaws, the resulting injury to the non-management stockholders is independent of and distinct from any injury to the corporation. Indeed, whatever injury results is to the stockholders within the corporate structure that have lost relative power, not to the corporation as an entity. After all, the corporation as an entity has not lost the power to do anything, it is power to cause the corporation to do certain things that has shifted. Nor are all stockholders injured equally in such circumstances, since whatever injury has been suffered has been borne disproportionately, if not exclusively, by the non-management stockholders whose power has been diminished.

█ In concluding that the complaint states individual as well as derivative claims, I in no manner comment on the merits of the claims pled by the plaintiffs here. The claims are hardly of overwhelming strength.[20] However, the dis-

---

19. That is, the Management Block (or at least Pomerantz's portion) may be able to command a premium over that which would be available to other stockholders in a sales transaction.

20. By way of example, the proposition that a corporate board may be held liable for proposing that 8 *Del. C.* § 203—a state law—apply to the corporation seems on its face to be quite extraordinary and implausible.

tinction between a derivative and individual claim does not turn on the strength of the asserted claims, but the nature of them. *Lipton,* 514 A.2d at 1079 n. 4; *Avacus,* mem. op. at 14.

### IV.

For all these reasons, I deny the defendants' objection to class certification. Plaintiffs shall present, after notice as to form, a conforming order.