[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION, INCLUDING STATUTORY FINDINGS, ON PETITION FOR TERMINATION OF PARENTAL RIGHTS
This is a petition for the termination of parental rights based on the putative father's abandonment of the child, Na'Sharice S, and his lack of an ongoing relationship with her, and the failure of the respondent mother (respondent) as well as the putative father to rehabilitate.
Based on clear and convincing evidence, the following facts are found. The respondent, who was born on May, 27, 1980, gave birth to the child on January 22, 1997. On January 24, 1997, DCF invoked a 96 hour hold on the child because the mother was homeless. The child was returned to the mother when she returned to her maternal grandmother's home to reside. In February, 1997, the respondent then left this home with the child to reside with a cousin, James Gaston, after a DCF social worker visited the grandmother's home. The respondent's whereabouts then became unknown to DCF.
On May 9, 1997, the respondent was arrested for assaulting her sixteen year old sister, Tonya. The respondent left her child with inappropriate caretakers living at 88 Nelson Street, Hartford. On May 9, 19997, the maternal grandmother visited the home on 88 Nelson Street and observed the child in a child carrier with alcohol bottles surrounding her. There was a stereo speaker near the child with music playing loudly in the infant's ear. The grandmother observed people lying on the floor. No one was supervising the child. Based on these observations, the grandmother removed the child to her home.
When the respondent was released from her arrest she did not attempt to retrieve her child, although she did continue to receive public monies for the child, in the form of Aid to Families with Dependent Children. She resided at 83 Nelson Street. The exterior of this apartment was laden with broken bottles, garbage, and syringes. The front door was broken. The interior of the apartment was filthy. Eight people inhabited the apartment The respondent admitted to a social worker that the apartment was unsafe for a child and that she had no income or resources to provide for her daughter. She agreed to allow her child to remain with her grandmother. The respondent informed a DCF social worker that she wanted to secure employment and permanent housing before reunifying with her child.
On July, 14, 1997, the respondent contacted her DCF social worker and informed her that she no longer resided at 88 Nelson Street but did not CT Page 11785 have a permanent address.
On July 8, 1997, the social worker transported the respondent to visit with the child. The respondent bathed the child and interacted appropriately with her. The respondent agreed to meet the social worker again on July 15, 1997 for another visit with the child.
On July 15, 1997, the respondent did not appear for the scheduled appointment with the social worker.
On July 21, 1997, the respondent called the grandmother to discuss removing the child from her care. The grandmother refused. Subsequently, the respondent contacted her DCF social worker, became argumentative and insisted that she be permitted to take her child.
While the child had been in the respondent's care, the respondent had missed pediatric appointments in February and May, 1997. As a result, the child had not received necessary immunizations. When the grandmother brought the child for a pediatric appointment in May, 1997, the child had eczema which had resulted in loss of hair. The child also was underweight. As a result of the grandmother's care, these two conditions improved substantially.
Because of the mother's threat to remove the child from the grandmother's care, DCF applied for and the court granted an application for an order of temporary custody on July 23, 1997. On that date, DCF also filed a petition alleging that the child was neglected and uncared for, and asking that she be committed to DCF. At that time, the court(Santos, J.) ordered that the respondent and Wayne Stewart, then believed to be the child's father (1) keep all appointments set by or with DCF and to cooperate with DCF home visits, announced or unannounced; (2) keep whereabouts known to DCF; (3) visit the child as often as DCF permits; (4) participate in individual and parenting counseling; (5) submit to substance abuse assessment and follow recommendations regarding treatment; (6) obtain and/or cooperate with a restraining order to avoid future violent incidents; (7) sign releases authorizing DCF to communicate with service providers to monitor attendance, cooperation and progress; (8) secure and maintain adequate housing and legal income; (9) no substance abuse; (10) no involvement with the criminal justice system.
The child was subsequently placed by DCF with a foster family.
From July 23, 1997 to December 24, 1997, the respondent did not keep her whereabouts known to DCF. As a result, she did not participate in any services. On December 24, 1997. the respondent contacted DCF, disclosed CT Page 11786 her whereabouts and expressed her willingness to participate in services. The respondent was referred to the Family and Support Resource Center at Manchester Memorial Hospital for parenting education. She began the program in February, 1998 but was discontinued from the program for failure to attend.
In February, 1998, the respondent was referred to East Hartford Youth Services for individual counseling. She was discontinued from that program in May, 1998 for failure to attend.
On or about July 2, 1998 the respondent entered the Job Corps program. The Job Corps offered the respondent classes to prepare for a G.E.D., job training skills, parenting education and counseling. On November 6, 1998, the respondent was terminated from this program because she was repeatedly involved in verbal altercations with other residents and engaged in behavior that other residents found threatening.
In September, 1993, DCF referred the respondent to the Family Clinic at Southern Connecticut State university. DCF made this referral based on the opinion of the respondent's Job Corps counselor that the respondent required more intensive counseling than Job Corps offered. The respondent was given four counseling appointments. She failed to attend any of them.
Following her discharge from the Job Corps, the respondent entered the Salvation Army Family Shelter. In November, 1998, the respondent began the Salvation Army's Young Parent Program. She began attending classes for her G.E.D., and received parenting education. The respondent stopped attending the program in mid-January, 1999.
In November, 1998, DCF referred the respondent for individual counseling with either the Village for Families and Children or Catholic Family Services. The respondent elected to have counseling through Catholic Family Services. She began treatment in December, 1998 but stopped attending in January, 1999.
On January 6, 1999 the police responded to a dispute that the respondent had with a potential employer.
On January 27, 1999, the respondent's DCF social worker met with her to discuss an impending court hearing and to inform her of DCF's case plan. The child was present during this meeting. The respondent became very belligerent and began screaming and using profane language directed to the worker. The social worker summoned security guards who requested that the respondent leave the building. CT Page 11787
In February, 1999, the respondent discharged herself from the Marshall House shelter. She informed DCF that she was living in a boarding house on Vine Street. On March 10, 1999, her social worker attempted to locate the respondent but learned that she, in fact, was no longer living there. The respondent did not notify DCF of her whereabouts.
In February, 1999, the respondent began attending Hartford Adult Education Center to obtain her diploma. Upon visiting this program on March 11, 1999, to ascertain the respondent's whereabouts, her social worker learned that she was no longer attending classes.
On March 11, 1999, the respondent's social worker learned from the respondent's grandmother that the respondent was living at Interval House. In mid-March, the respondent was asked to leave that shelter because of an altercation with a staff member. On April 29, 1999, the respondent false reported to DCF that she continued to reside at Interval House.
On April 29, 1999, her social worker instructed the respondent to contact her therapist at Catholic Family Services to resume therapy. The respondent failed to do so.
On May 5, 1999. the respondent was again referred to Manchester Memorial Hospital Parent Education Program. She failed to attend.
On July 19, 1999, DCF filed a petition to terminate the respondent's parental rights and those of the respondent father. At the time of filing, Na'Sharice was two years five months old. She is now 3 1/2 years old.
General Statutes § 17a-112 provides that the court may terminate the parental rights of a parent if it finds, based on clear and convincing evidence that termination is in the best interests of the child and that "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. . . ."
"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the . . . court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the CT Page 11788 court to find, by clear and convincing evidence, that the level of rehabilitation [she] has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date [she] can assume a responsible position in [his] child's life. . . . [I]n assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue."
"[Thus] [t]he inquiry for the . . . court [is] whether the respondent achieved such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child. . . . This inquiry require [sib the court to obtain a historical perspective of the respondent's child caring and parenting abilities." In re Sarah Ann K., 57 Conn. App. 441, 448-49, 747 A.2d 77
(2000)
Here, as in Sarah Ann K., "[t]here was little or no evidence to suggest that the respondent had ever played a constructive and useful role as a parent." Id., 449. Moreover, the court finds based on clear and convincing evidence that the respondent has not achieved any degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child. Moreover, it clearly is in the child's best interests that the respondent's parental rights be terminated.
 Mandatory Findings
General Statutes § 17a-112(d) provides: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the CT Page 11789 parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."
Having considered these matters, the court finds, based on clear and convincing evidence, that Na'Sharice has been abandoned by her biological father, Haze R in the sense that he has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of Na'Sharice. The court also finds that there is no on-going parent-child relationship between Haze R and Na'Sharice, "which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment . . . of such parent-child relationship would be detrimental to the best interests of the child." General Statutes § 17a-112(c)(2)(D). The court further finds that Na'Sharice was found by the Superior Court to have been neglected and uncared for in a prior proceeding, that her mother, the respondent Tanisha R had been provided specific steps to take to facilitate the return of Na'Sharice to her pursuant to General Statutes § 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child.
The court further finds that it is in the best interests of Na'Sharice that the respondent's parental rights be and they are hereby terminated.
The court hereby finds the following in the above matter by clear and convincing evidence:
1. (Finding regarding the timeliness, nature and extent of servicesoffered, provided, and made available to the parent and the child by achild-placing agency to facilitate the reunion of the child with theparent.)
It was unnecessary and would have been unreasonable if not impossible to offer, provide or make services available to putative father Haze R. CT Page 11790
The respondent mother was timely offered the services of Wheeler Clinic, a psychological evaluation, East Hartford Youth Services, and the family clinic at Southern Connecticut Sate University.
2. (Finding regarding whether DCF has made reasonable efforts toreunite the family pursuant to the Federal Child Welfare Act of 1980, asamended.)
Reunification was not feasible, as found by the court on May 27, 1999. The biological father Haze R has been whereabouts unknown throughout almost all of these proceedings. The respondent mother resisted services that might have made reunification feasible.
3. (Finding regarding the terms of any applicable court order enteredinto and agreed upon by any individual or child-placing agency and theparent, and the extent to which all parties have fulfilled theirobligations under such order.)
The applicable court order is contained in Exhibit 2, the terms of which are incorporated herein, and quoted supra.
Other than attending evaluations, a one-day commitment, the respondent failed to avail herself of services. She visited her daughter only sporadically. She failed to pursue necessary individual and parenting counseling.
4. (Finding regarding the feelings and emotional ties of the child withrespect to the child's parents, any guardian of the child's person andany person who has exercised physical care, custody or control of thechild for at least one year and with whom the child has developedsignificant emotional ties.)
The child has some feelings and emotional ties with respect to Tanisha R.; none with respect to the putative father. The feelings toward the mother, however, are confused. She is thoroughly emotionally bonded to her foster parents and their family, completely integrated into their family, and considers her foster parents her psychological parents.
5. (Finding regarding the age of the child.)
Na'Sharice is now 3 1/2 year of age, having been born on January 1997.
6. (Finding regarding the efforts the parent has made to adjust suchparent's circumstances, conduct or conditions to make it in the bestinterest of the child to return the child to the parent's home in theCT Page 11791foreseeable future, including, but not limited to: (A) the extent towhich the parent has maintained contact with the child as part of aneffort to reunite the child with the parent; provided the court may giveweight to incidental visitations, communications or contributions, and(B) the maintenance of regular contact or communication with the guardianor other custodian of he child.)
The putative father Haze R has made no efforts to adjust his circumstances, conduct or conditions to make it in the best interest of Na'Sharice to be with him. Other than attending evaluations, a one-day commitment, the respondent mother failed to avail herself of services. She visited her daughter only sporadically. She failed to pursue necessary individual and parenting counseling. She lacks resources and employment. She remains unsettled, immature, unskilled in parenting. During the child's commitment to DCF, and even when the child stayed with the maternal great grandmother, she visited her daughter only sporadically.
7. (Finding regarding the extent to which a parent has been preventedfrom maintaining a meaningful relationship with the child by theunreasonable act or conduct of the other parent of the child, or theunreasonable act of any other person or by the economic circumstances ofthe parent.)
No respondent has been prevented from maintaining a meaningful relationship with Na'Sharice by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by their own economic circumstances.
Based on the foregoing findings, the court determines that it is in Na'Sharice's best interest for a termination of parental rights to be granted with respect to the mother Tanisha R and the putative biological father Haze R. Accordingly, such a termination of parental rights is ordered. It is further ordered that the Commissioner of the department of Children and Families is appointed statutory parent for Na'Sharice for the purpose of securing a permanent adoptive family. If the foster parents are willing to adopt, as the foster mother so testified, it is the court's order that they receive first consideration. The commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by state and federal law.
Dated at Middletown this 26th day of September, 2000.
BY THE COURT CT Page 11792
Bruce L. Levin Judge of the Superior Court