# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WALTER E. RYAN, JR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12717-VCG |
| | ) | |
| ALAN S. ARMSTRONG; JOSEPH R. | ) | |
| CLEVELAND; KATHLEEN B. | ) | |
| COOPER; JOHN A. HAGG; JUANITA | ) | |
| H. HINSHAW; RALPH IZZO; FRANK | ) | |
| T. MACINNIS; ERIC W. | ) | |
| MANDELBLATT; KEITH A. | ) | |
| MEISTER; STEVEN W. NANCE; | ) | |
| MURRAY D. SMITH; JANICE D. | ) | |
| STONEY; and LAURA A. SUGG, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| THE WILLIAMS COMPANIES, INC., | ) | |
| | ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: January 31, 2017
Date Decided: May 15, 2017

Stuart M. Grant, Michael J. Barry, Michael T. Manuel, of GRANT & EISENHOFER P.A., Wilmington, Delaware; OF COUNSEL: Clinton A. Krislov, of KRISLOV & ASSOCIATES, LTD., Chicago, Illinois, *Attorneys for Plaintiff*.

Peter J. Walsh, Jr., Michael A. Pittenger, Andrew H. Sauder, Jacob R. Kirkham, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: Sandra C. Goldstein, Antony L. Ryan, of CRAVATH, SWAINE & MOORE LLP, New York, New York, *Attorneys for Defendants*.

GLASSCOCK, Vice Chancellor

In 2015, a pipeline company, Energy Transfer Equity, L.P. ("ETE"), saw an opportunity in the acquisition of another energy entity, The Williams Companies ("Williams"). ETE pursued Williams, obtaining a merger contract. For reasons not pertinent here, a condition precedent to the transaction failed, and what would have been a merger of two large entities came a-cropper. That failure was father to numerous legal actions, of which the instant case is one.

Before Williams and ETE agreed to merge, Williams controlled a limited partnership, Williams Partners L.P. ("WPZ"). Williams owned 60% of WPZ, and controlled its general partner. Shortly before negotiations between Williams and ETE commenced, Williams decided to acquire the independent minority interest in WPZ. After the Williams-WPZ agreement (the "WPZ Acquisition") was reached, ETE made an offer to buy Williams, at a substantial premium. ETE, as part of that bid to acquire Williams, required Williams to vitiate its agreement to acquire the balance of WPZ. Williams did so, incurring a $410 million break-up fee and other expenses. Ultimately, the Williams-ETE merger itself was rendered unenforceable by failure of a condition precedent, as limned above.

The Plaintiff, a Williams stockholder, brings this litigation, purportedly derivatively on behalf of Williams. The Plaintiff seeks to recoup from Williams' directors the losses suffered by Williams, incurred by entry and then cancellation of the WPZ Acquisition. The Defendants are the directors of Williams who approved

1

those actions (the "Director Defendants"). Because Williams has an exculpatory clause for directors, I may ultimately award the damages the Plaintiff seeks only upon a determination that the Director Defendants breached a duty of loyalty owed to Williams. This case, unlike recent cases in this Court, is not susceptible to the so-called *Corwin* doctrine whereby a fully informed, non-coerced shareholder vote will invoke the business judgment rule. Here, no qualifying vote occurred: this case involves a purported defensive measure theoretically designed by the Director Defendants to prevent a transaction that they then ultimately approved, but which nonetheless failed. Because the ETE merger never took place, the cost of removing the purported defensive mechanism fell solely on Williams, on behalf of which the Plaintiff seeks monetary damages from the Director Defendants. I note that Williams itself is pursuing recovery for the same losses against ETE, the failed merger counterparty, in separate litigation.

The matter is before me on the Defendants' Motion to Dismiss. The right to recover for any fiduciary breach here is an asset belonging to Williams, and like any corporate asset the directors control its disposition. Court of Chancery Rule 23.1 exists to vindicate director control: it requires a demand that the board pursue an action, or a showing that demand is excused, before a stockholder may proceed derivatively on behalf of her corporation. The Plaintiff here has not made a demand on the Williams board of directors to pursue this matter. Under Rule 23.1, I must

2

dismiss this action unless the complaint pleads specific facts that, if true, raise a reasonable doubt that a majority of the directors are capable of validly exercising their business judgment with respect to the matter.

Here, the suit the Plaintiff seeks to pursue is against the directors who entered the agreement to acquire WPZ. A majority of the board as of the commencement of this action is composed of those Director Defendants. The primary ground upon which the Plaintiff seeks to satisfy Rule 23.1 is that he has pled a viable claim for review under *Unocal*,[1] and therefore the majority of the board cannot evaluate the demand.[2]

The Plaintiff's theory here is that Williams, and its directors, were aware before entering the WPZ Acquisition that ETE was interested in acquiring Williams; that Armstrong, Williams' CEO, motivated by a dislike of ETE and its management, or by a desire to entrench himself, engineered the WPZ Acquisition as a defensive measure, designed to make Williams harder for ETE to swallow; and that the other directors voted in favor to entrench themselves. According to the Plaintiff, such a defensive measure cannot withstand the enhanced judicial scrutiny of the reasonableness of an anti-takeover defense, which the Plaintiff contends is the applicable standard of review here under the *Unocal* doctrine. It is true that, after

---

[1] *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del. 1985).
[2] *See* Jan. 31, 2017 Oral Argument Tr. 47:22–48:5.

ETE offered a substantial premium to acquire Williams conditioned on Williams' withdrawal from the WPZ Acquisition, the directors abrogated the agreement with WPZ, but by then, according to the Plaintiff, fiduciary duties had been breached and the damage was done; the break-up fee and other costs of withdrawing were incurred by Williams. The Plaintiff alleges that the Director Defendants conceived the WPZ Acquisition as a defensive measure to fend off ETE, and then further put in place needless devices to protect the WPZ deal; devices, according to the Plaintiff, that had no function other than to make Williams acquisition by ETE less palatable. He avers, in conclusory fashion, that the Defendants were collectively motivated by entrenchment.

The parties dispute whether *Unocal* applies in a damages action, that is, whether enhanced scrutiny applies primarily, or solely, where scrutiny can aid vindication of stockholders' right to consider a merger transaction, via injunctive relief. Because of my decision here, I need not directly address this question. It is clear, however, that *Unocal* enhanced scrutiny is primarily a tool for this Court to provide equitable relief where defensive measures by directors threaten the stockholders' right to approve a value-enhancing transaction. In such a case, where directors cannot show that a defensive measure is reasonable, a plaintiff has satisfied the first, merits-based prong of an injunctive relief analysis. This permits the Court (where irreparable harm and balance in favor of relief are also shown) to impose

4

injunctive relief to remove the unreasonable impediment to a transaction. In other words, enhanced scrutiny allows preliminary injunctive relief without a showing by the plaintiff that it is probable that a defendant has breached a fiduciary duty. The standard is modified, in the *Unocal* framework, because of the inherent motive for entrenchment where directors take measures to fend off a suitor.

How *Unocal* scrutiny applies in a damages action—especially in the face of an exculpatory provision where ultimately the plaintiff must demonstrate a breach of the duty of loyalty—is less clear. I need not reach this issue, however, unless the Plaintiff can first demonstrate that demand is excused. The Plaintiff here seeks only to impose *damages* on the directors who created the purportedly-defensive measures (removed by them prior to this litigation). Considering the exculpatory clause here, even gross negligence on the directors' parts is insufficient to an award of damages: to recover, the Plaintiff must demonstrate disloyalty. It is in this context that I must evaluate the directors' *ability to bring their business judgment to bear* in considering whether demand is excused. There are no particularized allegations here that the Director Defendants (with a single exception) are not disinterested and independent, other than the conclusory allegation regarding entrenchment. If the Director Defendants also face no credible threat of the imposition of liability for a breach of loyalty, they are not disabled from considering a demand. Therefore, if the complaint does not plead specific facts that, if true, raise a substantial potential of

5

liability for breach of loyalty, I must dismiss under Rule 23.1. Ultimately, I find the Plaintiff has failed to so plead. My reasoning follows.

## I. BACKGROUND[3]

The following factual adumbration is sufficient to the issue before me. In short, the Plaintiff is challenging the transaction between Williams and a related party, WPZ. The Plaintiff alleges that the related-party transaction was an improper defensive mechanism that supports a breach of the duty of loyalty action against the Williams Board of Directors (the "Board").

*A. The Parties*

The Plaintiff, Walter E. Ryan, Jr., is a shareholder of Williams common stock, and has been at all times relevant to liability.[4]

Nominal Defendant, The Williams Companies ("Williams") is a large energy infrastructure company, with a particular focus on energy pipelines.[5] Williams is a Delaware Corporation.[6] Williams owns Williams Partners GP LLC ("Williams GP"), which is "the general partner and controller of" WPZ.[7] Williams owned

---

[3] The facts, except where otherwise noted, are drawn from the well-pled allegations of Plaintiff's Verified Derivative Complaint (the "Complaint" or "Compl.") and exhibits or documents incorporated by reference therein, which are presumed true for purposes of evaluating Defendants' Motion to Dismiss.
[4] Compl. ¶ 11.
[5] *See id.* at ¶ 1.
[6] *Id.* at ¶ 12.
[7] *Id.* at ¶ 1.

6

approximately 60% of the limited partnership units of WPZ.[8]  Further, Williams derives "some 85% of its revenues from its interests in" WPZ.[9]  WPZ was formed by Williams in 2005 "to own, operate, and acquire energy assets."[10]  WPZ is a Master Limited Partnership ("MLP").[11]

Non-Party ETE is a similarly-situated energy company, with a focus on energy pipelines and other energy infrastructure projects.[12]

The named Defendants (the "Director Defendants") were each members of the Williams Board at the time relevant to liability.[13]  The Director Defendants are: Alan S. Armstrong, Joseph R. Cleveland, Kathleen B. Cooper, John A. Hagg, Juanita H. Hinshaw, Ralph Izzo, Frank T. MacInnis, Eric W. Mandelblatt, Keith A. Meister, Steven W. Nance, Murray D. Smith, Janice D. Stoney, and Laura A. Sugg.[14]  The Board at the time of the Complaint included seven of the Director Defendants, "Armstrong, Cleveland, Cooper, Hagg, Hinshaw, Smith, and Stoney, along with three recently appointed directors . . ." who are not Defendants.[15]  Defendants Izzo, MacInnis, Mandelblatt, Meister, Nance, and Sugg resigned from the Board on June

---

[8] *Id.* at ¶ 29.
[9] *Id.* at ¶ 30.
[10] *Id.* at ¶ 38.
[11] *Id.* at ¶¶ 1, 28.
[12]  *See id.* at ¶ 32.
[13] *See, e.g.*, *id*. at ¶ 90.  *See also id.* at n.1 and accompanying text.
[14] *See id.*  I note that the Williams Board is protected by an exculpatory charter provision for violations of the duty of care.  *See* C.A. 11903-VCG Dkt. No. 37 Ex. C at Art. V ¶ F.
[15] Compl. ¶ 92.

7

30, 2016 following this Court's opinion declining to specifically enforce the ETE-Williams merger.[16]

*B. The Challenged Transaction*

The challenged transaction arises in the context of a larger and more complicated merger. In short, the Plaintiff's theory is that a transaction between Williams and WPZ was a defensive mechanism to thwart or discourage an acquisition of Williams by ETE. Below, I review the actions of the parties during the time relevant to liability.

The Complaint alleges that ETE, through its Chairman Kelcy Warren, started making acquisition overtures towards Williams as early as February 2014.[17] At this time Alan Armstrong of Williams indicated to Warren that Williams was not particularly interested but if an offer was made it would be taken to the Williams Board.[18] By November 2014, ETE's Chief Financial Officer approached Barclays Bank with "an informal indication of interest about a potential acquisition of Williams by ETE."[19] Barclays relayed this indication of interest to Williams' management.[20] ETE representatives "contacted Williams representatives on a number of occasions to discuss a potential transaction between ETE and Williams"

---

[16] *Id.* at ¶ 25. I note that the Board previously had at least thirteen members. *See id.* at ¶ 83.
[17] *Id.* at ¶ 44.
[18] *Id.*
[19] *Id.* at ¶ 45.
[20] *Id.*

through May, 2015.[21]  Due to an alleged "contentious history" stemming from (per a *Wall Street Journal* article) "a 2011 bidding war" where ETE bested Williams, such an acquisition from *Armstrong's* perspective was allegedly "undesirable."[22]

The Complaint alleges a transaction with WPZ was only considered by the Williams board *after* receiving indications of interest from ETE.[23]  By January 20, 2015, the Williams Board had received presentations from Barclays on strategic alternatives, including entity level structural changes, none of which Barclays recommended at that time.[24]  According to the Complaint, there were disadvantages to Williams in pursuing a transaction with WPZ—including tax, structural, and economic-performance drawbacks.[25]  The completeness and accuracy of the Complaint's characterization of the various Barclays presentations—incorporated into the Complaint—is in dispute.[26]  In briefing, the Plaintiff asserts that "[t]he Board repeatedly was informed that Williams would realize no present benefits *at all* by acquiring WPZ."[27]  This argument is weakened by the presentations upon which the Plaintiff relies in the Complaint.  For example, Barclays' January 20, 2015 presentation included as the "pros" for the WPZ Acquisition that it would provide a

---

[21] *Id.*
[22] *Id.* at ¶ 46.
[23] *See id.* at ¶¶ 47–48.
[24] *Id.* at ¶¶ 49–50.
[25] *See id.* at ¶¶ 52–59.  *But see* Defs' Reply Br. 25–27 (challenging characterizations of certain Barclays presentations in the Complaint).
[26] *See* Defs' Reply Br. 25–27.
[27] Pl's Answering Br. 29 (citing Compl. ¶¶ 51, 61–62) (emphasis in original).

"[s]implified organizational structure;" a "large step-up to shield future taxable income;" and that depending on valuations "exchanging MLP equity for C-Corp stock could be accretive to dividend per share."[28]  Further, later Barclays presentations relied upon in the Complaint,[29] provide that the WPZ Acquisition would "improve Williams' access to and cost-of-capital," simplify the organizational structure leading to "streamlined governance and modest cost savings," provide a tax shield in the future, and be accretive "due to valuation differentials."[30]  While it is improper to weigh the pros and cons of the WPZ Acquisition at this stage, portions of the Barclays presentations, relied upon in the Complaint, make clear that there were at least some benefits as well as the highlighted drawbacks to the WPZ Acquisition.

Through March 2015 several presentations were made by Barclays covering the pros and cons of a potential WPZ Acquisition.[31]  In any event, by a March 31, 2015 Williams Board meeting, "the Board was intent on going forward" with a transaction with WPZ.[32]

---

[28] *See* Jan. 20, 2017 Transmittal Affidavit of Jacob R. Kirkham in Support of Defendants' Reply Brief ("Kirkham Aff.") Ex. A at RYAN0000372.
[29] *See* Compl. ¶¶ 62–64.
[30] Kirkham Aff. Ex. C at RYAN0000133.
[31] *See* Compl. ¶¶ 60, 62.
[32] *Id.* at ¶ 62.

An initial offer was made on April 9, 2015, by Williams to WPZ's conflicts committee, proposing to acquire the independent minority of WPZ.[33] The offer represented a 6% premium for WPZ unitholders.[34] On May 7, 2015, WPZ countered, seeking a 24% premium.[35] Williams returned to WPZ days later with a 16.8% premium offer,[36] with consideration to be paid in Williams shares.[37] On May 12, 2015, the Board entered an agreement on those terms to purchase the remaining units of WPZ that it did not already own (the "WPZ Acquisition").[38] The WPZ Acquisition was publicly announced on May 13, 2015.[39] The total value of the transaction was $13 billion.[40]

The WPZ Acquisition included a force-the-vote provision requiring Williams to submit the WPZ Acquisition to a vote by Williams shareholders.[41] Similarly, it included a $410 million termination fee payable by a waiver of Incentive Distribution Rights ("IDRs") or in cash.[42] The Complaint alleges the WPZ Acquisition itself, along with the deal-protection devices of the termination fee and

---

[33] *Id.* at ¶ 66.
[34] *Id.*
[35] *Id.* at ¶ 67.
[36] *Id.*
[37] *Id.* at ¶¶ 66, 68.
[38] *Id.* at ¶ 3.
[39] *Id.* at ¶ 70.
[40] *Id.* at ¶ 68.
[41] *Id.* at ¶¶ 6, 74.
[42] *Id.* at ¶¶ 72–73.

force-the-vote provision, were improper defensive mechanisms the purpose of which was to thwart an acquisition by ETE.[43]

A week after the WPZ Acquisition was announced, on May 19, 2015, ETE announced an offer to acquire Williams at a 32% premium.[44] ETE's acquisition offer was conditioned on Williams canceling the WPZ Acquisition.[45] Ultimately, on September 28, 2015, Williams accepted an offer from ETE.[46] As discussed above, the WPZ Acquisition contained a contractual provision requiring payment in the event of a termination, as a result, Williams paid a $410 million termination fee.[47] Additionally, Williams paid a further $18 million to cancel the force-the-vote provision contained in the WPZ Acquisition agreement.[48] In total Williams paid $428 million to terminate the WPZ Acquisition and pursue the transaction with ETE. Thus, the alleged defensive transaction, and the deal-protection devices within that transaction, were removed in the fall of 2015 in favor of a transaction with ETE. Ultimately, the transaction with ETE itself did not close, following the failure of a condition precedent.[49]

---

[43] *See, e.g.*, *id.* at ¶¶ 75, 85.
[44] *Id.* at ¶¶ 5, 77.
[45] *Id.* at ¶¶ 5, 84.
[46] *Id.* at ¶¶ 7, 82.
[47] *Id.* at ¶¶ 8, 84.
[48] *Id.*
[49] *Id.* at ¶ 9. *See generally Williams Companies, Inc. v. Energy Transfer Equity, L.P.*, 2016 WL 3576682 (Del. Ch. June 24, 2016), *aff'd*, 2017 WL 1090912 (Del. Mar. 23, 2017).

## C. Specific Allegations Regarding the Director Defendants

The Complaint presents scant particularized allegations about the motives, background, or relationships of any of the Director Defendants other than Alan Armstrong.[50] The only specific factual allegations regarding the Director Defendants, other than Armstrong, are that they, as a group, allegedly "ignored" ETE;[51] that they rushed the WPZ Acquisition;[52] that they voted in favor of the WPZ Acquisition[53] and, initially, against the ETE Merger;[54] and that "a majority of the Current Board was interested in the thwarting of the ETE-Williams Merger because each receives substantial salaries, bonuses, payments, benefits, *and/or* other emoluments by virtue of service on the Board."[55] There are *no* particularized allegations regarding what this "majority" received via board service, that receipt of any compensation was material to them, or that they were in any way beholden to Armstrong. The closest the Complaint comes to a particularized allegation regarding the majority of the Director Defendants is the conclusion that they voted in favor of the WPZ Acquisition:

> because they knew that in the event that Williams was acquired by any potential bidder, most or all of the directors of Williams and its senior management would, either in connection with the acquisition or shortly

---

[50] *See* Compl. ¶¶ 13–24.
[51] *See, e.g.*, *id.* at ¶ 47 (alleging that "Williams management and its Board repeatedly ignored ETE's efforts").
[52] *See, e.g.*, *id.* at ¶ 69.
[53] *Id.* at ¶ 92.
[54] *Id.* at ¶ 83.
[55] *Id.* at ¶ 93 (emphasis added).

thereafter, be removed from the Board of the surviving company because their services would not be necessary. They would be mere surplusage and, thus, an acquisition would bring an end to their power, prestige and profit. In so acting, Williams's directors and those in management allied with them have been aggrandizing their own personal positions and interests over those of Williams and its stockholders to whom they owe fundamental fiduciary duties not to entrench themselves in office.[56]

Similarly, the Complaint concludes that "the timing and the deal protection measures of the WPZ Acquisition demonstrate that it was approved for purposes of entrenchment" and asks me to infer bad faith on behalf of the Director Defendants.[57] Yet the Complaint provides *no* specific factual allegations regarding any actions, or motivations that the Director Defendants had, or their particular financial circumstances; it baldly alleges a defensive measure, then presumes entrenchment is the motivation.

With respect to Armstrong, the Complaint states that he "is a director, President and Chief Executive Officer of Williams, as well as Chairman of the Board and Chief Executive Officer of WPZ."[58] Further, Armstrong is the Chairman and CEO of Williams GP.[59] Additionally, Armstrong worked at Williams "for nearly three decades" and if ETE acquired Williams, "ETE would be able to terminate Armstrong" from his various positions.[60] Also, "Armstrong received $11,604,615

---

[56] *Id.* at ¶ 101.
[57] *Id.* at ¶ 92.
[58] *Id.* at ¶ 13.
[59] *Id.* at ¶ 29.
[60] *Id.* at ¶ 46.

in total compensation from Williams in 2014."[61] As mentioned above, the Complaint alleges that the "prospect of a takeover of Williams by ETE was all the more undesirable to Armstrong" because according to a 2015 *Wall Street Journal* article there was a "contentious history" arising from ETE "beating out Williams in a 2011 bidding war . . . ."[62]

### D. This Litigation

The procedural history of this matter is winding, and raises concerns about the viability of the present action. A near-identical complaint to that before me here was first filed in a separate action by the same Plaintiff.[63] The first action was pled as a direct claim (the "Direct Action").[64] A motion to dismiss was filed in the Direct Action, after which the Plaintiff amended his complaint.[65] A renewed motion ensued.[66] Each opening brief—both to the initial complaint in the Direct Action, and the amended complaint in the Direct Action—argued for dismissal, on, among other grounds, that the action was in fact derivative and not direct.[67] Despite these arguments, the Plaintiff elected to stand on his amended complaint in the Direct Action and filed an answering brief in response to the motion to dismiss on August

---

[61] *Id.* at ¶ 13.
[62] *Id.* at ¶ 46.
[63] *See* C.A. No. 11903-VCG Dkt. No. 29.
[64] *Id.*
[65] C.A. No. 11903-VCG Dkt. Nos. 23, 29.
[66] C.A. No. 11903-VCG Dkt. Nos. 31, 37.
[67] *See* C.A. No. 11903-VCG Dkt. Nos. 23, 37.

12, 2016.[68] I note this answering brief in the Direct Action was filed *after* the ETE-Williams Merger was terminated. Thus, the threat of the merger extinguishing a derivative claim was not present. The motion to dismiss the Direct Action was fully briefed on August 29, 2016.[69] However, before argument was held on that motion, the Plaintiff filed a separate and nearly identical action—this action—on September 2, 2016, asserting the same claim *derivatively* (the "Derivative Action").[70] Ultimately, the Plaintiff moved to voluntarily dismiss the Direct Action on December 23, 2016,[71] and via teleconference of January 12, 2017, I dismissed the Direct Action while reserving decision on any preclusive effect the dismissal of the direct litigation may have worked on this later, practically identical derivative litigation, by analogy to Rule 15(aaa).

This Derivative Action alleges the precise claim asserted, and dismissed, in the Direct Action. The gravamen of the operative Complaint here is that the Williams Board improperly entered the WPZ Acquisition, which included unnecessary deal-protection devices, purely as a defensive mechanism. The Plaintiff asserts that the Director Defendants breached the duty of loyalty by implementing an "unreasonable and disproportionate defensive measure designed to thwart a

---

[68] *See* C.A. No. 11903-VCG Dkt. No. 42.

[69] *See* C.A. No. 11903-VCG Dkt. No. 44.

[70] A redline between the Direct Complaint and the Derivative Complaint highlights the similarity. *See* C.A. No. 12717-VCG Dkt. No. 11 Ex. A

[71] Citing the grounds for the voluntary dismissal as a recent Supreme Court decision. *See* C.A. No. 11903-VCG Dkt. No. 57.

premium offer from ETE" by entering the WPZ Acquisition.[72] The Plaintiff's theory is that the Defendants approved the WPZ Acquisition to secure continuation of their "power, prestige and profit."[73]

The Defendants moved to dismiss this Derivative Action on various grounds, briefly discussed below. Argument was held on the Defendants' Motion to Dismiss the Derivative Action on January 31, 2017. This Memorandum Opinion grants Defendants' Motion for the reasons that follow.

## II. ANALYSIS

The Defendants moved to dismiss the Complaint pursuant to Court of Chancery Rules 15(aaa), 12(b)(6), and 23.1. While the Rule 15(aaa) basis of the motion, addressing the procedure described above, is by no means frivolous, I address the pending Motion to Dismiss on a more fundamental ground, the failure to adequately plead demand futility.

The Plaintiff's theory of the case is based on the premise that the Court should evaluate the conduct of the Defendants through the "prism" of *Unocal* in determining whether the Complaint has stated a claim for the sole count alleged: breach of the duty of loyalty.[74] According to the Plaintiff at oral argument, he relies on pleading a "*Unocal*" claim to excuse demand; he contended stoutly that such a

---

[72] *See* Compl. ¶¶ 96–102.
[73] *Id.* at ¶ 101.
[74] *See* Jan. 31, 2017 Oral Argument Tr. 46:16–47:17.

17

pleading is sufficient.[75]  As discussed below, I disagree.  I assume that the Complaint contains sufficient facts, drawing all inferences in the light most favorable to the Plaintiff, such that a *Unocal* standard of review—to the extent applicable to a damages claim—was triggered.  In other words, if this case were before me on a request for preliminary injunctive relief the burden would be on the Defendants to demonstrate that the alleged defensive measure was reasonable.  Nonetheless, the Plaintiff has failed to satisfy his burden under Rule 23.1.  That is, I find that the Plaintiff has failed to allege particularized facts sufficient to create a reasonable doubt that the demand board could validly exercise its judgment in considering a demand.

*A. Unocal's Application*

The Defendants have moved to dismiss this action pursuant to Rule 12(b)(6) for failure to state a claim arguing, primarily, that the Complaint does not adequately plead the "necessary threshold facts" to trigger *Unocal* and that the Defendants are therefore protected by the business judgment rule.[76]  The standard of review for a 12(b)(6) motion is well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the nonmoving party; and (iv) dismissal is inappropriate

---

[75] *See id.*; *id.* at 47:22–48:11 ("I need *Unocal* to get around the demand requirement."); *id.* at 63:22–64:3.

[76] *See* Defs' Opening Br. 35–38.

18

unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[77]

The Court "is not, however, required to accept as true conclusory allegations 'without specific supporting factual allegations.'"[78]

Before addressing the merits of the motion, I pause to emphasize, again, that the recovery sought in this damages action arises from a long-since-removed purported defensive action and the monetary outflows associated with the removal of that alleged defensive action. That is, the recovery sought here is for a past, historic injury, based on a purported defensive device which has itself been abated. To recover damages for that injury, the Plaintiff asserts he is aided by the "prism" of enhanced scrutiny of *Unocal* and its progeny.[79] Here the Board voluntarily removed the alleged defensive mechanism, signed a deal with ETE, and unsuccessfully sued ETE to specifically perform the merger. Further, the Williams Board is presently pursuing litigation seeking recovery *from ETE* for the costs incurred in connection with termination of the WPZ Acquisition. The Plaintiff here seeks to pursue, on behalf of Williams shareholders, litigation against the Williams Directors to seek recovery of the same costs from the Director Defendants who pursued and approved the WPZ Acquisition.

---

[77] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotations omitted).

[78] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 65–66 (Del. 1995)).

[79] *See* Jan. 31, 2017 Oral Argument Tr. 46:16–47:17.

Directors exercising their judgment on behalf of their corporation are protected by the business judgment rule, which provides wide deference to director decisions. Certain recurring circumstances have arisen, however, where the Court has recognized the need to take a more direct role in overseeing the actions of the board, before application of the business judgment rule.[80] These include, notably, the case of directors taking measures to fend off a potential acquisition of the company, which actions raise entrenchment concerns.[81] Here, the Plaintiff alleges that the WPZ Acquisition was, by its nature, terms, and timing, a defensive act that properly triggers enhanced scrutiny. The Supreme Court has explained that "[e]nhanced judicial scrutiny under *Unocal* applies whenever the record reflects that a board of directors took defensive measures in response to a perceived threat to corporate policy and effectiveness which touches upon issues of control."[82] *Unocal* can be triggered during an active hostile battle for corporate control, but also can be "applied to a preemptive defensive measure where the corporation was not under immediate attack."[83] To invoke *Unocal* the plaintiff must plead facts that show that

---

[80] *See, e.g.*, *Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 928 (Del. 2003) (explaining that "[t]here are certain circumstances, however, which mandate that a court take a more direct and active role in overseeing the decisions made and actions taken by directors. In these situations, a court subjects the directors' conduct to enhanced scrutiny to ensure that it is reasonable, before the protections of the business judgment rule may be conferred") (footnotes and internal quotations omitted).

[81] *See Unocal*, 493 A.2d at 954–55.

[82] *In re Santa Fe*, 669 A.2d at 71 (internal quotations and citations omitted).

[83] *See Stroud v. Grace*, 606 A.2d 75, 82 (Del. 1992) (internal quotation omitted).

the "board perceive[d] a threat to control and t[ook] defensive measures in response to the threat."[84]  Stated another way, *Unocal* attaches when the Complaint alleges "threatened external action from which it could reasonably be inferred that the defendants acted defensively."[85]  The burden then shifts to the directors to demonstrate that the defensive mechanism was "reasonable."[86]  Because an entrenchment motive is potentially implicated by defensive measures, enhanced scrutiny is justified; therefore, to trigger *Unocal* it is necessary that the transaction subject to review was defensive.[87]

The *Unocal* decision itself does not clearly address what constitutes a sufficient pleading that an action is "defensive," for purposes of Rule 12(b)(6).  As a later decision in this Court observed "[i]n *Unocal* there was no question . . . that the exchange offer there at issue was a defensive measure. Thus, the [*Unocal*] Court did not address the preliminary question of how to evaluate whether a particular action is or is not a defense against a potential takeover."[88]  I note that many decisions look at the triggering of *Unocal* through the lens of a pre-close motion for injunctive relief, rather than an after-the-fact damages action.  The Supreme Court has made clear, however, that "[a]bsent an actual threat to corporate control or action

---

[84] *Id.* (internal quotation omitted).

[85] *Gantler v. Stephens*, 965 A.2d 695, 705 (Del. 2009) (internal quotations omitted).

[86] *See In re Santa Fe*, 669 A.2d at 71.

[87] *Gantler*, 965 A.2d at 705 (observing that a necessary "premise" to trigger *Unocal* is that the transaction subject to review was defensive).

[88] *eDoskocil Companies Inc. v. Griggy*, 1988 WL 85491, at *5 (Del. Ch. Aug. 18, 1988).

substantially taken for the purpose of entrenchment, the actions of the board are judged under the business judgment rule" rather than enhanced scrutiny.[89] Similarly, this Court has recognized that "[a] corporate action with collateral effects including a tendency to preserve incumbent control is not *per se* subject to *Unocal* scrutiny."[90]

Here the Plaintiff relies on the following characterization of his Complaint in support of attaching *Unocal* as the standard of review on the basis that "an entrenchment motive" is a reasonable inference:[91]

- "Williams operated with WPZ in the 'holdco/MLP' structure since 2005, demonstrating a significant history of and continuing commitment to that business model, with no indication that the strategy was being reconsidered at all, until the contact from ETE;"[92]

- "The Williams Board first considered the WPZ 'buy-in' with other strategic alternatives within a month of Anderson's approach by ETE's Chief Financial Officer;"[93]

- "The Board perceived ETE's interest as a threat to their control over the Company;"[94]

- "The Board repeatedly was informed that Williams would realize no present benefits *at all* by acquiring WPZ;"[95]

- "The Board knew that an acquisition of WPZ would require payment of a substantial above-market premium (and actually agreed to pay a price even

---

[89] *Kahn on Behalf of DeKalb Genetics Corp. v. Roberts*, 679 A.2d 460, 466 (Del. 1996) (citation omitted).

[90] *In re Ebix, Inc. Stockholder Litig.*, 2016 WL 208402, at *18 (Del. Ch. Jan. 15, 2016) (citations omitted).

[91] Pl's Answering Br. 28.

[92] *Id.* (citing Compl. ¶ 39).

[93] *Id.* at 29 (citing Compl. ¶ 48).

[94] *Id.* (citing Compl. ¶ 46).

[95] *Id.* (citing Compl. ¶¶ 51, 61–62) (emphasis in original).

higher than both Barclays's projection and precedent transactions) for a company that was underperforming its peers across a number of metrics; and"[96]

- "Williams negotiated the WPZ Acquisition in less than four days, agreeing to a premium that greatly exceeded any comparable transaction and included deal protections that were completely unnecessary."[97]

The Plaintiff urges that these allegations counsel in favor of attaching *Unocal* as the standard of review at the pleading stage.

The Defendants attack this timeline and its substance,[98] correctly pointing out that a number of allegations in the briefing are not entirely consistent with what is pled in the Complaint.[99] This is a motion to dismiss, however; pursuant to the 12(b)(6) standard, the Plaintiff is entitled to all rational inferences which flow from his well-pled factual allegations. The question here is whether the facts pled, when viewed in the light *most favorable* to the Plaintiff, are sufficient to produce a proper pleading stage inference that the acts were "defensive measures" that were "employed in the context of a contest for control."[100] Here, to the extent *Unocal's* application is at issue, the Plaintiff has pled facts from which one reasonably conceivable inference is that the Board, aware of ETE's interest in a transaction,

---

[96] *Id.* (citing Compl. ¶¶ 56–58, 60, 62, 67, 68).
[97] *Id.* (citing Compl. ¶¶ 63, 71–74).
[98] *See* Defs' Reply Br. 23–27.
[99] *See id. Compare* Pl's Answering Br. 29 (citing Compl. ¶ 46) *with* Compl. ¶ 46. *See also supra* notes 27–31 and accompanying text.
[100] *See In re Santa Fe*, 669 A.2d at 71 (explaining that "[o]nce the plaintiff establishes that defensive measures have been employed in the context of a contest for control" then the directors have the burden of meeting the two part *Unocal* standard).

23

perceived ETE as a threat and entered the WPZ Acquisition in response.[101] This is not the only reasonable inference that may be drawn from the timeline present here, but the Plaintiff is entitled, at the pleading stage, to the benefit of any reasonable inference. Thus, this analysis assumes for the purposes of this motion that the WPZ Acquisition was a defensive measure in response to a threat, and so triggers *Unocal* enhanced scrutiny.

The parties spent significant effort to support their divergent positions on whether, and how, enhanced scrutiny as called for in the *Revlon* and *Unocal* lines of cases applies to a *damages* action. Cases in this jurisdiction have indicated that, once *Unocal* attaches, a pleading-stage dismissal is generally not appropriate.[102] Conversely, our Supreme Court observed in 2015 that:

> *Unocal* and *Revlon* are primarily designed to give stockholders and the Court of Chancery *the tool of injunctive relief to address important M & A decisions in real time, before closing. They were not tools designed with post-closing money damages claims in mind*, the standards they articulate do not match the gross negligence standard for director due care liability under *Van Gorkom,* and with the prevalence of exculpatory charter provisions, due care liability is rarely even available.[103]

---

[101] *See e.g.*, *In re Ebix*, 2016 WL 208402, at *19 (finding at the pleading stage that the circumstances surrounding one particular purported defensive act "establishes a factual chronology that, viewed in a light most favorable to Plaintiffs, supports Plaintiffs' contention" that it was a defensive mechanism, in response to an announced proxy contest).

[102] *See, e.g.*, *In re Santa Fe*, 669 A.2d at 71–72.

[103] *Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304, 312 (Del. 2015) (internal footnotes omitted) (emphasis added). The Supreme Court's discussion, I note, was in the context of the effect a fully-informed non-coerced shareholder vote would have on the standard of review. The Court in *Corwin* held such a vote would invoke the business judgment rule, over the plaintiff's objection

24

Notwithstanding that statement, the Plaintiff asserts that *Unocal* applies in this damages action and aids them in stating a claim sufficient to withstand a motion to dismiss. The Plaintiff argues that the Defendants "violated their fiduciary duties under *Unocal* in bad faith" and that therefore the matter must go forward to create a substantive record upon which the Defendants' loyalty may be put to the test.[104] The Plaintiff acknowledges that the Supreme Court recently held in *In re Cornerstone Therapeutics, Inc. Stockholder Litigation* that

> [a] plaintiff seeking only monetary damages must plead non-exculpated claims against a director who is protected by an exculpatory charter provision to survive a motion to dismiss, regardless of the underlying standard of review for the board's conduct—be it *Revlon, Unocal,* the entire fairness standard, or the business judgment rule.[105]

---

that such result should not obtain because it would "would impair the operation of *Unocal* and *Revlon* . . . . " *Id.* at 312 (footnotes omitted).

[104] *See* Pl's Answering Br. 30. *Unocal*, however, like *Revlon*, is not a "duty" unto itself—rather, it is a standard of review. While enhanced scrutiny recognizes the threat that directors may be acting with mixed motives when they enact a defensive mechanism or a sell a company, it does not change the fact that a duty of loyalty violation is required to recover damages, where a board is protected by an exculpatory charter provision. *See In re Morton's Rest. Grp., Inc. Shareholders Litig.*, 74 A.3d 656, 663–64 (Del. Ch. 2013) (finding that even when *Revlon* enhanced scrutiny applies, a plaintiff must plead facts that give rise to a duty of loyalty action when the board is protected by an exculpatory provision); *In re NYMEX S'holder Litig.*, 2009 WL 3206051, at *6 (Del. Ch. Sept. 30, 2009) (noting that "even if *Revlon* applied to this case, application of the exculpatory clause would lead to dismissal unless the Plaintiffs have successfully pleaded a failure to act loyally (or in good faith), which would preclude reliance on the Section 102(b)(7) provision") (citation omitted). That is, a plaintiff in a damages action, even with enhanced scrutiny as the standard of review, cannot simply allege the act was unreasonable, the act must be disloyal. *See Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) (observing that "there is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties").

[105] *In re Cornerstone Therapeutics Inc, Stockholder Litig.*, 115 A.3d 1173, 1175–76 (Del. 2015) (footnotes omitted).

25

The Plaintiff argues, however, that the quoted language *supports* his position, that the "underlying standard," here *Unocal*, *persists* in a post-transaction action for damages.[106] That position, to my mind, is hard to square with *Cornerstone*. I need not directly address this issue, however, because for the reasons explained below, I find this action barred by failure to make demand under Rule 23.1.

*B. Rule 23.1*

Court of Chancery Rule 23.1 requires that a Plaintiff either make a demand on the board or allege with particularity why demand is excused.[107] This requirement is not merely procedural; it is substantive. The demand requirement recognizes a principal tenet of corporate law: that "directors, rather than shareholders, manage the business and affairs of the corporation."[108] In cases such as this, where the plaintiff has not made a pre-suit demand on the board, "the Complaint must be dismissed unless it alleges particularized facts showing that demand would have been futile."[109]

---

[106] *See* Pl's Answering Br. 25–26.

[107] *See* Del. Ch. Ct. R. 23.1 (providing that a plaintiff's complaint shall "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort").

[108] *See Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[109] *Ryan v. Gursahaney*, 2015 WL 1915911, at *5 (Del. Ch. Apr. 28, 2015) (citation omitted).

26

The crux of the Court's inquiry is that set out by our Supreme Court in *Rales v. Blasband*:[110] whether the majority of the board, as it exists at the time the complaint is filed, is capable of considering the demand in light of the circumstances.[111] The "spirit" that "animates" the respective demand futility tests under Delaware law "is a Court's unwillingness to set aside the prerogatives of a board of directors unless the derivative plaintiff has shown some reason to doubt that the board will exercise its discretion impartially and in good faith."[112]

The Plaintiff recognized at oral argument that he needs "*Unocal* to get around the demand requirement."[113] That concession was apt; the Plaintiff has not attempted to plead via particularized facts, on a director-by-director basis, that a majority of the board is interested in the transaction, or lacks independence; he relies on the inference of entrenchment that arises under *Unocal.* Such a bare inference, as discussed below, falls short of demonstrating a disabling interest, which requires a substantial likelihood of liability lacking under the facts pled here. While certain case law in this area is difficult to reconcile, I find that the fact that an action implicates enhanced scrutiny under *Unocal* is insufficient *on its own* to satisfy Rule 23.1. Instead, as explained below, to excuse demand, facts must be pled in the

---

[110] *Rales v. Blasband*, 634 A.2d 927 (Del. 1993).
[111] *See id.* at 934. *See, e.g.*, *In re INFOUSA, Inc. Shareholders Litig.*, 953 A.2d 963, 985–90 (Del. Ch. 2007) (performing a director by director inquiry).
[112] *In re INFOUSA*, 953 A.2d at 986.
[113] Jan. 31, 2017 Oral Argument Tr. 47:22–48:5.

complaint sufficient to create a reasonable doubt that a majority of directors were incapable of exercising business judgment. The Complaint does not meet this standard.

1. The Existence of an Underlying "*Unocal*" Claim is Not Sufficient to Excuse Demand

The overarching rationale for Rule 23.1 is clear: a cause of action is an asset of the corporation under the control of the directors. This director-control model is fundamental to the corporate form, which separates ownership and control in a way that has proved value enhancing. Under some conditions, however, the directors are disabled from exercising that control via application of their business judgment, on behalf of the corporation. In such cases, the director-control model and the good of the entity are in tension. Rule 23.1 addresses that tension. A stockholder wishing herself to deploy a corporate asset through litigation must first make a demand that the board pursue the matter; such a demand concedes that the directors' ability to deploy business judgment is not impaired. Or, she may proceed absent a demand, but only where she demonstrates through her complaint that demand should be excused as futile. The overarching test for futility is stated in *Rales*;[114] the complaint must plead specific facts that if true, and together with reasonable inferences

---

[114] *See, e.g.*, *David B. Shaev Profit Sharing Account v. Armstrong*, 2006 WL 391931, at *4 (Del. Ch. Feb. 13, 2006) (observing that "[t]his court has held in the past that the *Rales* test, in reality, folds the two-pronged *Aronson* test into one broader examination").

28

therefrom, create a reasonable doubt that a majority of the directors could exercise business judgment with respect to the demand.[115]

In order to satisfy the demand requirement, it became clear at oral argument that the Plaintiff relies on the Complaint's pleading of a *Unocal* claim, discussed above.[116] Such reliance is understandable given our case-law.[117] Below, I examine the cases suggesting that a well-pled *Unocal* claim is, standing alone, sufficient to excuse demand.[118] Such a discussion is of particular importance here given the relative weakness of the Plaintiff's *Unocal* claim. As discussed below, those cases, due to the specific context in which they arose, and in light of subsequent Supreme Court precedent, are not persuasive in this matter.

---

[115] *See Rales*, 634 A.2d at 934 (stating the test as follows: "a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand").

[116] *See, e.g.*, Jan. 31, 2017 Oral Argument Tr. 48:4–5.

[117] *But see In re INFOUSA*, 953 A.2d at 986–90 (rejecting certain automatic excusal theories and examining specific allegations to determine whether a majority of the board were capable of considering demand); *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 2015 WL 4192107, at *15 (Del. Ch. July 13, 2015) (rejecting an argument that demand would be automatically excused if entire fairness attached to the transaction, finding that while the argument "has some superficial appeal, it is inconsistent with controlling authority in my opinion"); *id. at* *15 n.121 (noting that "[g]iven that the second prong of *Aronson* asks simply whether the challenged transaction was otherwise the product of a valid exercise of business judgment, it is understandable how one might find that test to be satisfied whenever entire fairness review might be triggered, irrespective of the circumstances triggering such review or the nature of the claims to which such review might apply") (internal quotation and citation omitted).

[118] While the Plaintiff appeared to rely on this "automatic excusal theory" at argument, it was not addressed in briefing.

The most recent iteration of the "automatic *Unocal* excusal" language comes from a 2014 Court of Chancery decision, *In re Ebix, Inc. Stockholder Litigation*.[119] The *Ebix* Court noted that the "potentially thorny issue" of whether a *Unocal* claim in that case was direct or derivative

> may be largely avoided when resolving the Defendants' motion to dismiss under Rule 23.1 if the claim implicates the heightened scrutiny of *Unocal Corporation v. Mesa Petroleum* and its progeny: if the claim is derivative, then demand is excused, and if the claim is direct, then no demand was ever necessary under the Court of Chancery Rules.[120]

The *Ebix* court relied on an earlier decision of this Court,[121] *In re Gaylord Container Corp. Shareholders Litigation*,[122] for the proposition that a well-pled *Unocal* claim would excuse demand.[123] *Gaylord* indicated that there is generally "automatic demand excusal" in cases invoking *Unocal*'s enhanced scrutiny.[124] The Court's discussion, however, was—like *Ebix*—in the context of considering whether the particular *Unocal* claim in that action was direct or derivative.[125] Specifically, then-Vice Chancellor Strine observed that:

> [t]he derivative-individual claim distinction is already of no practical importance at the pre-transaction stage of corporate litigation-the stage at which *Unocal* claims are often most hotly contested. So long as the

---

[119] 2014 WL 3696655, at *15–16 (Del. Ch. July 24, 2014).
[120] *Id.* at *15 (citing *In re Gaylord Container Corp. Shareholders Litig.*, 747 A.2d 71, 81 (Del. Ch. 1999)) (internal footnote omitted).
[121] *Id.*
[122] *In re Gaylord Container Corp. Shareholders Litig.*, 747 A.2d 71 (Del. Ch. 1999).
[123] *See In re Ebix*, 2014 WL 3696655, at *15–16.
[124] *In re Gaylord Container*, 747 A.2d at 83.
[125] *Id.* at 81–83. I note that the *Gaylord* opinion, relied upon in *Ebix*, concerned whether class certification was proper, which turned, in part, on whether the claim was direct. *Id.* at 72.

plaintiff states a claim implicating the heightened scrutiny required by *Unocal,* demand has been excused under the *Aronson v. Lewis* demand excusal test.[126]

That finding—that demand was excused—was law-of-the-case in *Gaylord,* following an earlier opinion in the case by a different Vice Chancellor.[127] These two cases, *Gaylord,* and *Ebix* in reliance on *Gaylord,* both made the statements regarding automatic demand excusal in the context of explaining the minimal importance of addressing whether such claims were direct or derivative. I find instructive the cases upon which *Gaylord* relies for the proposition that a well-pled *Unocal* claim excuses demand.[128] *Gaylord* relies in part on the Court of Chancery's decision in *Moran v. Household International, Inc.,*[129] concerning the relationship between a *Unocal* claim and demand futility.[130] In *Moran* the Court of Chancery denied a motion to dismiss pursuant to Rule 23.1. The *Moran* Court reasoned as follows in finding demand excused:

> [a]lthough we are not involved here with defensive tactics adopted by the board in response to a specific takeover threat, the 'primary purpose' standard is also applicable to prospective anti-takeover

---

[126] *In re Gaylord Container*, 747 A.2d at 81 (internal citations omitted) (citing *Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1071 (Del. Ch. 1985); *Carmody v. Toll Bros.*, 723 A.2d 1180, 1189 (Del. Ch. 1998); *Wells Fargo & Co. v. First Interstate Bancorp.*, 1996 WL 32169, at *8 (Del. Ch. Jan. 18, 1996); *In re Chrysler Corp. Shareholders Litig.*, 1992 WL 181024, at *4–5 (Del. Ch. July 27, 1992)).

[127] *See In re Gaylord Container*, 747 A.2d at 82. *See also In re Gaylord Container Corp. Shareholders Litig.*, 1996 WL 752356, at *2 (Del. Ch. Dec. 19, 1996).

[128] *See supra* note 126.

[129] *Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1071 (Del. Ch. 1985), *aff'd*, 500 A.2d 1346 (Del. 1985) *disapproved of on other grounds by Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004).

[130] *See In re Gaylord Container*, 747 A.2d at 81.

31

devices. Thus, it is not surprising that plaintiffs allege that the Household directors attempted to manipulate the internal corporate machinery of Household for the sole and primary purpose of entrenching themselves in office. Of course, this allegation, standing alone, will not suffice to excuse demand. Rather, the complaint must allege specific facts which demonstrate that the primary purpose of management was to retain control. In my view, the plaintiffs' complaints, which set forth particularized facts alleging that the Rights Plan deters *all* hostile takeover attempts through its limitation on alienability of shares and the exercise of proxy rights, sufficiently pleads a primary purpose to retain control, and thus casts a reasonable doubt as to the disinterestedness and independence of the board at this stage of the proceedings.[131]

Similarly, *Gaylord* relies on *Carmody v. Toll Brothers*, *Inc*.[132] The Court in *Toll Brothers* held that the plaintiffs' claims were direct, but in the alternative if they were properly considered derivative it was of no consequence because "[t]he complaint . . . alleges in *a particularized way* that the Toll Brothers directors acted for entrenchment purposes. Under our case law, that is sufficient to excuse the requirement of a demand."[133]

Further, another case relied upon in *Gaylord*,[134] *In re Chrysler Corporation Shareholders Litigation*,[135] explained that, in the context of entrenchment arguments

---

[131] *Moran*, 490 A.2d at 1071 (internal citations and quotations omitted) (emphasis in original).
[132] *In re Gaylord Container*, 747 A.2d at 81 (citing *Carmody v. Toll Bros.*, 723 A.2d 1180, 1189 (Del. Ch. 1998)).
[133] *Toll Bros.*, 723 A.2d at 1188–89 (citing *In re Chrysler Corp.*, 1992 WL 181024, at *4–5; *Wells Fargo & Co.*, 1996 WL 32169, at *8) (emphasis added). I note the defensive action in *Toll Brothers* was a "dead hand" poison pill. *Toll Bros.*, 723 A.2d at 1182.
[134] *In re Gaylord Container*, 747 A.2d at 81 (citing *In re Chrysler Corp.*, 1992 WL 181024, at *4–5).
[135] 1992 WL 181024, at *4 (Del. Ch. July 27, 1992).

surrounding a Rule 23.1 motion, the plaintiff's complaint must create "a reasonable doubt that the directors were motivated solely or primarily by entrenchment concerns."[136] Stated another way, "the complaint must create a reasonable doubt that entrenchment was the directors' 'sole or primary purpose,' demand is not excused if from the complaint it appears that the challenged action 'could, at least as easily, serve a valid corporate purpose as an improper purpose, such as entrenchment.'"[137]

I am satisfied, after a review of the analysis in decisions underlying the statements made in *Gaylord* and repeated in *Ebix*, that the presence of a narrowly pled *Unocal* claim here does not operate to excuse demand *per se*. The common thread in those underlying cases—requiring a specific pleading that entrenchment was the defendants' primary purpose, in order to demonstrate demand futility—I find consistent with a *Rales* analysis under Rule 23.1, requiring a pleading of specific facts sufficient to conclude that the directors' exercise of business judgment is disabled. Further, I find instructive other cases in this Court that have declined automatic excusal theories, in favor of individual director-by-director analysis based on the particularized allegations of the Complaint.[138] To the extent the *Gaylord* line

---

[136] *Id.* at *5 (citations omitted).

[137] *Id.* at *4 (quoting *Cottle v. Standard Brands Paint Co.*, 1990 WL 34824, at *8 (Del. Ch. Mar. 22, 1990)).

[138] *See Baiera*, 2015 WL 4192107, at *15–17 (declining to adopt an automatic demand excusal theory premised on the argument that the entire fairness standard of review triggers such a *per se* excusal, and noting "[t]he focus instead . . . is on whether Plaintiff's allegations raise a reasonable

of cases holds that a pleading sufficient to invoke *Unocal* at the pre-closing stage is also sufficient to excuse demand under Rule 23.1, I decline to follow those cases. The recent Supreme Court holding in *Cornerstone* I find instructive. There, the Court found that even where entire fairness initially applies to review of a transaction, a plaintiff must plead a non-exculpated claim against each individual defendant to avoid dismissal of that defendant in an action for damages. It is in that light that I must analyze demand futility: whether the Plaintiffs here have pled facts that raise a reasonable doubt that the Director Defendants can exercise business judgment in considering a demand. I cannot square *Cornerstone* with a *per se* rule that defendant directors are incapable of evaluating a demand, solely because a well-pled *Unocal* claim exists, although of course specific pleadings that a majority of directors were motivated primarily by entrenchment or other non-corporate considerations will show demand futility.

I proceed, therefore, on the assumption that the Plaintiff's derivative claims here must be dismissed unless the Complaint demonstrates demand would be futile,

---

doubt as to the impartially of a majority of the Demand Board to have considered such a demand"); *id.* (observing that "neither the presence of a controlling stockholder nor allegations of self-dealing by a controlling stockholder changes the director-based focus of the demand futility inquiry"). *See also In re INFOUSA*, 953 A.2d at 986–990; *id.* at 989 (observing that "[t]o excuse demand in this case it is not enough to show that the defendants approved a discriminatory poison pill, granted [the CEO] generous share options or allowed the [CEO's family] to carry out self-interested transactions. Instead, the plaintiff must provide the Court with *reason to suspect that each director did so not because they felt it to be in the best interests of the company, but out of self-interest or a loyalty to, or fear of reprisal from*, [the CEO]. It is to this analysis that I now turn.") (emphasis added).

consistent with the analyses set out in *Rales* and *Aronson v. Lewis*,[139] regardless of whether the underlying facts state a claim under *Unocal*.

## 2. The Plaintiff Has Failed to Plead Demand Futility Under *Aronson*

As stated above, a plaintiff may not maintain litigation derivatively on behalf of a corporation, absent demand, unless she demonstrates via specific pleading that there is a reasonable doubt whether a majority of the directors are capable of bringing business judgment to bear on such a demand. Our Supreme Court has provided the specific test that applies where, as here, the suit involves a challenge to action of the directors who themselves would evaluate the demand, set out in *Aronson*.[140] The *Aronson* test has two parts: first, does the particularized pleading create a reasonable doubt that the directors were not disinterested or independent in making the decision?[141] Or, if it does not, does the pleading create a reasonable doubt that the decision was otherwise not the product of business judgment?[142] If so, under *Aronson*, demand is excused.

The *Aronson* test must be understood in the context of the overarching test for demand futility laid out in *Rales*:[143] could the directors bring business judgment to

---

[139] 473 A.2d 805, 811 (Del. 1984).
[140] *Id.* at 814. That is, this Court has employed the *Aronson* analysis in circumstances where the "decision of the board is challenged." *In re INFOUSA*, 953 A.2d at 986.
[141] *See Aronson*, 473 A.2d at 814.
[142] *See id.*
[143] *See In re Duke Energy Corp. Derivative Litig.*, 2016 WL 4543788, at *15 (Del. Ch. Aug. 31, 2016) (noting that "[a]s a matter of doctrine, *Rales* is better thought of as the general test, with *Aronson* indicative of its application in a specific context") (citation omitted). *See also Guttman*

bear on the demand? The first prong of the *Aronson* inquiry addresses director compliance with the duty of loyalty: if the directors made the underlying decision under the influence of self-interest, or dependent on a third party, they have breached a duty of loyalty, and are liable for loss caused thereby. In such a circumstance, there is a reasonable doubt whether those directors can exercise their business judgment on a demand to sue themselves. Similarly with *Aronson's* second prong: actions of directors inexplicable with reference to business judgment are made in bad faith, implicating director liability. Such directors are disabled from considering a demand to sue themselves, and demand would be futile.[144]

The Complaint here alleges entrenchment as the Defendants motive in the challenged transaction. Addressing such an allegation under *Aronson* is a rather awkward fit, but I examine here whether the Complaint satisfies that test, as addressed by the Plaintiff in briefing.[145]

---

*v. Huang*, 823 A.2d 492, 500–502 (Del. Ch. 2003) (explaining that in certain circumstances the *Rales* and the *Aronson* tests "are only subtly different, because the policy justification for each test points the court toward a similar analysis"); *id.* at 501 (observing that *Rales'* "singular inquiry makes germane all of the concerns relevant to both the first and second prongs of *Aronson*").

[144] Absent an exculpatory clause, an action not the product of business judgment, because uninformed, would also implicate director liability and excuse demand.

[145] In briefing, the Plaintiff pursued three theories: first, that the Defendants' votes in favor of the WPZ Acquisition expose them to a substantial likelihood of liability making them "interested" under the first prong of *Aronson*; second, that the transaction and its terms lacked a legitimate business purpose and demand is excused under the second prong of *Aronson*; and finally, that the Defendants acted for entrenchment purposes and therefore demand is excused under the second prong of *Aronson*. *See* Pl's Answering Br. 39–42.

The Plaintiff purports to satisfy both prongs of *Aronson*,[146] and his arguments are essentially the same for both. He alleges generally that the complained-of actions of the Board in acquiring WPZ, and in initially resisting the advances of ETE, were defensive in nature, and taken not for the benefit of Williams, but for motives of entrenchment. Under this theory, the directors were thus tainted by self-interest, and took actions inexplicable under business judgment, satisfying *Aronson*. But the Plaintiff understates the showing required under *Aronson*. The Plaintiff relies on the pleading of a *Unocal* claim to satisfy Rule 23.1,[147] which, for reasons above, I reject. Instead, the first prong of *Aronson* requires the trial court to determine whether the complaint pleads particularized facts sufficient to raise a reasonable doubt as to the disinterestedness or independence of at least half of the board.[148] The recurring situation in which the Court will consider a director interested arises when she stands to "receive a personal financial benefit from a transaction that is not equally shared by the stockholders."[149] A director lacks independence where she is "beholden" to

---

[146] *Id.* at 39 (arguing that the "Complaint establishes demand futility under both prongs" of *Aronson*).

[147] *See* Jan. 31, 2017 Oral Argument Tr. 47:22–48:5.

[148] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1046 n.8 (Del. 2004).

[149] *Rales*, 634 A.2d at 936 (citing *Aronson*, 473 A.2d at 812). Conversely, "[d]irectorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Id.*

a controller or another interested person and that such person's influence would sterilize her exercise of discretion.[150]

Here the Plaintiff asserts that demand is excused because "at least half of the members of the Demand Board" suffer a disabling interest under the first prong of *Aronson* via exposure to a "substantial likelihood of liability" for the alleged breach of the duty of loyalty "by voting in favor of the WPZ Acquisition, and subsequently voting twice against the ETE Merger."[151] The Plaintiff thus argues generally that a majority of the Directors suffer such a "disabling interest."[152] The Plaintiff asserts that the majority of directors participated in the defensive actions via their vote, and therefore entrenchment must have been the motive, making each director subject to liability for breach of the duty of loyalty. This is quintessential conclusive pleading of a mere threat of liability. The Complaint is bare of the type of director-specific pleading that would imply that the risk of liability is substantial. In the absence of director-specific pleadings implying that a director was under the control of Armstrong, or that the merger with ETE would have caused her to lose directorship fees material to her, there is simply a lack of specific pleadings showing a breach of loyalty. In other words, the Complaint lacks specific pleadings that, if true, create a reasonable doubt that a substantial likelihood of liability would cause a majority of

---

[150] *See Aronson*, 473 A.2d at 814–15.
[151] Pl's Answering Br. 39 (citing *Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. 2007)).
[152] *Id.*

38

directors to face liability, disabling their exercise of business judgment and excusing demand.[153]

In support of his argument that demand is excused via a substantial likelihood of liability for a majority of the Board here, the Plaintiff relies primarily on the Court of Chancery's decision in *Ryan v. Gifford*.[154]  *Gifford* quotes *In re Baxter International, Inc. Shareholders Litigation*,[155] for the proposition that directors suffer from a disabling interest in considering a pre-suit demand when "the potential for liability is not a mere threat but instead may rise to a substantial likelihood."[156] *Gifford* found such a substantial likelihood of liability existed on the facts of that case, and that it constituted one of the "rare" such cases so egregious on its face that the threat of liability would excuse demand.[157]  The alleged actions in *Gifford* were quintessential misconduct; it involved backdating of options while "simultaneously" lying to shareholders, conduct which made it "difficult to conceive" how such acts

---

[153] As the Supreme Court explained in *Aronson*, a "substantial likelihood of director liability" exists only "in rare cases [where] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment." *Aronson*, 473 A.2d at 815.  Similarly, *Aronson* teaches that "the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient . . . " in the absence of "egregious" or "rare cases." *Id.*  Additionally, "[w]here directors are contractually or otherwise exculpated from liability for certain conduct, 'then a serious threat of liability may only be found to exist if the plaintiff pleads a *non-exculpated* claim against the directors based on particularized facts.'"  *Wood v. Baum*, 953 A.2d 136, 141 (Del. 2008) (quoting *Guttman*, 823 A.2d at 501).

[154] 918 A.2d 341 (Del. Ch. 2007). *See* Pl's Answering Br. 39 n.124.

[155] *In re Baxter Int'l, Inc. Shareholders Litig.*, 654 A.2d 1268, 1269 (Del. Ch. 1995).

[156] *Gifford*, 918 A.2d at 355 (quoting *In re Baxter*, 654 A.2d at 1269).

[157] *Id.*

could satisfy the duty of loyalty.[158]  Further, "three members of a board *approved* backdated options, and another board member accepted them."[159]

In contrast, in *In re Baxter*, on which *Gifford* relies, the Court reached the opposite conclusion—finding that it could not "conclude from the face of the complaint that this is a rare case where the circumstances are so egregious that there is a substantial likelihood of liability."[160]  *In re Baxter* arose out of an alleged "scheme" by Baxter employees to "systematically overcharge" the Veterans Administration for medical supplies which was later uncovered and harmed the company.[161]  Before finding the absence of a substantial likelihood of liability by the directors, the Court explained that

> "[a]lthough a short and plain statement showing that the pleader is entitled to relief is normally sufficient to state a claim, *it does not satisfy the requirement of pleading more than a mere threat of liability*. The court could not conclude that there is a substantial likelihood of liability from the face of a complaint *unless the claim is pled with sufficient particularity to permit the court to reasonably reach the required conclusion*."[162]

Further, when the defendants are protected by an exculpatory charter provision, as they are here, "the risk of liability does not disable them from considering a demand

---

[158] *Id.*
[159] *Id.* (emphasis in original).
[160] *In re Baxter*, 654 A.2d at 1271 (citing *Aronson*, 473 A.2d at 815).
[161] *Id.* at 1268–69.
[162] *Id.* at 1270.

fairly unless particularized pleading permits the court to conclude that there is a substantial likelihood that their conduct falls outside the exemption."[163]

Here the alleged conduct, which the Plaintiff contends demonstrates a substantial likelihood of liability, is a series of votes for or against particular transactions[164]—one of which narrowly creates an inference sufficient to trigger *Unocal's* enhanced scrutiny. I find that there is a failure of particularized facts that the actions of the Director Defendants were taken for disloyal purposes, however. The Complaint singles out *Armstrong's* motive to avoid a merger with ETE, and then alleges in conclusory fashion that the rest of the Board was motivated to preserve their positions; it makes no allegations such positions were material to them, no allegations of their animus towards ETE, and no allegations that their discretion was sterilized by Armstrong.

That is, I assume the facts alleged in the Complaint are true, and draw all reasonable inferences in the Plaintiff's favor. Nonetheless, I find that this Complaint fails to allege particularized facts sufficient for me to conclude that a substantial likelihood exists that the majority of the Board has violated its duty of loyalty, and that demand is therefore futile in the face of a threat of liability.[165] Because of the

---

[163] *Id.* at 1270.

[164] *See* Pl's Answering Br. 39.

[165] *See In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 654–55 (Del. Ch. 2008) (warning in the context of a demand futility allegation regarding a *Caremark* claim that "Courts should . . . be extremely chary about labeling what they perceive as deficiencies in the deliberations of an independent board majority over a discrete transaction as not merely negligence or even gross

41

dearth of particularized allegations, I cannot find that the majority of the Board faces a disabling interest with respect to the demand eschewed by Plaintiff here, and the Plaintiff's argument under *Aronson's* first prong accordingly fails.

In order for demand to be excused under the second prong of *Aronson* where, as here, the Defendants are exculpated from liability for the duty of care, the Plaintiff must plead facts raising an inference that the action complained of was taken in bad faith.[166] The Supreme Court has observed that a plaintiff carries a "heavy burden" in satisfying the second prong of *Aronson*.[167] The second prong has been referred to as a "safety valve" to permit suit where the majority of directors are otherwise disinterested and independent but "the complaint meets a heightened pleading standard of particularity" and the "threat of liability to the directors required to act on the demand is sufficiently substantial to cast a reasonable doubt over their impartiality."[168] In other words, the second prong excuses demand where the facts

---

negligence, but as involving bad faith"). *See also id.* at n.62 (noting that "[a]nother risk warrants mention, which arises if courts fail to recognize that not all situations governed by *Revlon* have the strong sniff of disloyalty that was present in the original case. *Revlon* was a case rooted in entrenchment and bias concerns, with incumbent managers preferring one bidder strongly over another when a sale became inevitable. Many of the early *Revlon* and *Unocal* . . . cases involved this flavor").

[166] *See id.* at 647–48; *id.* at 653 (noting that when a company has an exculpatory provision, "this court must be vigilant in reviewing the complaint . . . to make sure that it pleads particularized facts pleading a non-exculpated breach of fiduciary duty. That requires the plaintiffs to plead particularized facts supporting an inference that the directors committed a breach of the fiduciary duty of loyalty") (citations omitted). *But see McPadden v. Sidhu*, 964 A.2d 1262, 1270–75 (Del. Ch. 2008).

[167] *White v. Panic*, 783 A.2d 543, 551 (Del. 2001) (citations omitted).

[168] *Guttman*, 823 A.2d at 500.

pled disclose that rare case where "a transaction may be so egregious on its face that board approval cannot meet the test of business judgment."[169]

Where duty of care claims are exculpated, "the plaintiffs cannot rely on conclusory allegations, they must plead specific facts that support the inference that the [defendant] directors breached their fiduciary duty of loyalty."[170]  That is, "what is critical is that [the plaintiff] plead facts suggesting that the [defendant] directors breached their duty of loyalty by somehow acting in bad faith for reasons inimical to the best interests of the [company's] stockholders."[171]  Similarly, as this Court has recently explained, "[t]he second *Aronson* prong applies when the particularized facts are such that it is 'difficult to conceive' that a director could have satisfied his or her fiduciary duties."[172]

The first ground upon which the Plaintiff seeks to excuse demand under the second prong of *Aronson* is that the Complaint demonstrates the directors' actions were "taken for entrenchment purposes" and that demand is therefore excused.[173] For the reasons stated above, such a conclusory pleading is insufficient under Rule

---

[169] *Aronson*, 473 A.2d at 815.

[170] *In re Lear Corp.*, 967 A.2d at 647.

[171] *Id.* at 648.

[172] *Chester Cty. Employees' Ret. Fund v. New Residential Inv. Corp.*, 2016 WL 5865004, at *9 (Del. Ch. Oct. 7, 2016) (quoting *Gifford*, 918 A.2d at 355).

[173] Pl's Answering Br. 41.  I note that while this argument is made by the Plaintiff under the second prong of *Aronson*, courts have often considered the "entrenchment" theory of demand excusal under the first prong of *Aronson*.  *See* Edward P. Welch et al., *Folk on the Delaware General Corporation Law* § 327.04(b)(4)(d) at 13-119–20 (2017 Supp.) (collecting cases).

23.1. That is, the Plaintiff here has fallen short of pleading particularized facts sufficient to create a reasonable doubt that the demand board's sole or primary motivation was entrenchment, or otherwise demonstrate a substantial threat of liability.[174] The Complaint is silent as to the individual director's motivations, interests, and actions beyond its broad conclusory allegations. The Complaint lacks particularized factual allegations to permit me to infer that the majority of the Board acted solely or primarily to entrench themselves.

Beyond entrenchment, the Complaint alleges only that Armstrong disliked ETE due to antagonisms relating to an earlier "bidding war,"[175] and that the remaining Director Defendants voted in favor of the WPZ Acquisition to preserve their "power, prestige and profit."[176] This is simply a mirror image of the contentions addressed with respect to *Aronson's* first prong. There are no allegations regarding the Director Defendants' compensation and financial circumstances, or anything else sufficient to suggest that the directors, other than Armstrong, would have a non-corporate motive in approving the transaction. Nor is there any basis from the pleadings to infer that Armstrong's influence was so powerful as to sterilize the other

---

[174] *See, e.g.*, *In re Chrysler Corp.*, 1992 WL 181024, at *4 (explaining that "the complaint must create a reasonable doubt that entrenchment was the directors' 'sole or primary purpose,' demand is not excused if from the complaint it appears that the challenged action 'could, at least as easily, serve a valid corporate purpose as an improper purpose, such as entrenchment.'") (quoting *Cottle*, 1990 WL 34824, at *8).

[175] *See* Compl. ¶ 46.

[176] *See id.* at ¶ 101.

directors' discretion or that such directors were beholden to him. In short, I find that the Complaint fails to allege particularized facts to permit an inference that the majority of the Director Defendants acted with bad faith.[177]

Finally, the Plaintiff argues that demand must be excused here because there was "no *bona fide* corporate purpose" for the transaction and its terms; in other words, the WPZ Acquisition can only be explained by bad faith.[178] This is the "safety valve" theory of demand futility under *Aronson's* second prong explained above: An action inexplicable other than bad faith is sufficiently likely to imply liability that demand on directors taking such action is futile. Here, the Complaint involves directors, in the context of an expression of interest by a potential acquirer, themselves authorizing acquisition of the minority interest in a subsidiary,[179] then abandoning the acquisition when the acquirer made a sufficiently attractive offer. It is reasonably conceivable—although not conclusively so—that the acquisition by Williams of WPZ was meant as defensive to a takeover by ETE. The facts pled fall short, however, of providing an inference that the actions taken by the directors, even

---

[177] *See Gursahaney*, 2015 WL 1915911, at *8.

[178] *See* Pl's Answering Br. 40–41.

[179] After consulting with a banker, and after the banker laid out pros and cons to the WPZ Acquisition. *See*, *e.g.*, Kirkham Aff. Ex. C at RYAN0000144 ("We believe this transaction represents an attractive opportunity to significantly lower the cost of capital and enhance near and long term growth and valuation.").

45

if defensive, are inexplicable other than as bad faith.[180]  It is a truism that defensive actions may be loyal actions if reasonable.  They *may* also be loyal—although subject to injunctive relief—if unreasonable.  They may be loyal even though adopted in a grossly negligent way.  Nothing in the Complaint creates a reasonable doubt that bad-faith liability on the part of these defendants is likely, and the second prong of *Aronson* is not satisfied.

### III. CONCLUSION

The Plaintiff has pled facts raising a pleading-stage inference that actions taken by directors were a defensive reaction to a takeover threat.  He has failed, however, to plead sufficient particularized facts to imply a substantial likelihood of liability for damages arising out of those actions on the part of a majority of the directors.  Demand under Rule 23.1 is not excused, therefore.  Since the Plaintiff forwent demand, this derivative action is dismissed.  An Order is attached.

---

[180] Again, as noted in the factual background section, the rationale of the WPZ Acquisition was not completely devoid of support—the Barclays presentations relied upon in the Complaint provide both pros and cons to the WPZ Acquisition.

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| WALTER E. RYAN, JR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 12717-VCG |
| ) | |
| ALAN S. ARMSTRONG; JOSEPH R. ) | |
| CLEVELAND; KATHLEEN B. ) | |
| COOPER; JOHN A. HAGG; JUANITA ) | |
| H. HINSHAW; RALPH IZZO; FRANK ) | |
| T. MACINNIS; ERIC W. ) | |
| MANDELBLATT; KEITH A. ) | |
| MEISTER; STEVEN W. NANCE; ) | |
| MURRAY D. SMITH; JANICE D. ) | |
| STONEY; and LAURA A. SUGG, ) | |
| ) | |
| Defendants, ) | |
| ) | |
| THE WILLIAMS COMPANIES, INC., ) | |
| ) | |
| Nominal Defendant. ) | |

## ORDER

AND NOW, this 15th day of May, 2017,

The Court having considered Defendants' Motion to Dismiss, and for the reasons set forth in the Memorandum Opinion dated May 15, 2017, IT IS HEREBY ORDERED that the Motion is GRANTED.

SO ORDERED:

/s/ Sam Glasscock III

Vice Chancellor